**GILLMAN et al. v. STERN et al.**

No. 365.

Circuit Court of Appeals, Second Circuit.

Aug. 5, 1940.

Brown & Jones, of New York City (Donald L. Brown, of New York City, of counsel), for plaintiffs.

Henry L. Burkitt, of New York City, for defendant.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

Both the plaintiffs and the defendant appeal from the judgment in this action. The plaintiffs filed the usual complaint, asking an injunction for the infringement of Patent No. 1,919,674, issued on July 25, 1933, to the Sterling Airbrush Co., assignee of Laszlo Wenczel, for a pneumatic "puffing machine." The defendant set up a number of defenses: first, that the patent was invalid because inoperative, and too nearly anticipated by the published art; second, that it was not infringed; third, that there had been a prior use of it by one Haas, at least as early as 1930 (the application was filed on January 21, 1931); fourth, that the plaintiffs had disabled themselves from appealing to a court of equity because of their unconscionable conduct; fifth, that they had failed to show any title to the patent; and sixth,

that having released one Charles Bialor, one of the alleged infringers, they released the defendant, Stern. The defendant also filed a counterclaim, based upon the plaintiff's interference with his business by the wanton bringing of the suit in question, and asking damages on that ground. The judge held the patent invalid because anticipated by the prior use of Haas, and sustained the defense of the plaintiffs' inequitable conduct, but refused to make any finding as to the release. He also held that the defendant was himself guilty of inequitable conduct in selling the infringing machine before he knew that the patent had been anticipated, and for that reason dismissed his counterclaim.

The patent was for a pneumatic machine for quilting; i. e., it blew thread or yarn "into pockets formed in the fabric to stuff the same to impart a raised or embossed design" (p. 1, ll, 3–5). It was made of a hollow needle through which the thread or yarn passed; the inner end of the needle being within a frame which contained an air-duct leading from a blower. When the blower was turned on, it blew the yarn through the needle and stuffed the pocket which the needle point had entered. Before passing into the needle the thread passed through a "tube, 40," one end of which telescoped within the inner end of the needle, but did not quite block the access of air from the blower, which passed around the end of the "tube," sucked the thread or yarn, as it emerged from the "tube," and carried it through the needle. In operation, after the yarn has once been started, the "tube" was somewhat withdrawn (being for that purpose mounted in a "threaded shank") in order to secure a stronger air-flow through the needle.

The art contained nothing of the kind before except Haas' machine, of which more later. It is true, it had been common practice in many arts to introduce an air blast around the outside of a hollow tube introduced into the entrance of a larger tube through which the air escaped, and by this means to suck material from the smaller, through the larger, tube. The Venturi carbureter is an example of this; the circle of swiftly moving air entering the larger tube creates a vacuum at the end of the smaller and sucks the gasoline forward to make the mixture. The first attack upon the patent is that it was merely for a new use of an old device. However,

the only objection to patenting a new use is that the statute, § 31, Title 35, U.S. Code, 35 U.S.C.A. § 31, does not include "uses" among what can be patented, except so far as they are included within "arts"— i. e., processes. If, however, an old article must be physically changed, even slightly, to fit the new use, it becomes itself a new "machine" or "manufacture," and the statute is satisfied. In that case the only question open is whether the discovery of the new use demands enough original thought to be deemed an invention. Constitutionally only "discoveries" can be patented at all, and the ingenuity needed for the new conception, not the amount of physical readjustment, is the test of a valuable "discovery." Topliff v. Topliff, 145 U.S. 156, 163, 164, 12 S.Ct. 825, 36 L.Ed. 658; C. & A. Potts & Co. v. Creager, 155 U.S. 597, 608, 15 S.Ct. 194, 39 L.Ed. 275; Rockwood v. General Fire Extinguisher Co., 2 Cir., 8 F.2d 682, 686; Gordon Form Lathe Co. v. Walcott, 6 Cir., 32 F.2d 55, 58. No machines on the Venturi principle would have served to quilt fabrics; they were sand-blasters, sand engravers, vaporizers, grain conveyors, inspirators, air brushes, sprayers, separators, carbureters and the like. Most, if not all of them, were, moreover, of the true Venturi type; that is, they always worked by suction. As we have said, Wenczel's "puffer" did so too for as long as the end of the "tube, 40" was telescoped within the inner end of the needle; but not after it was withdrawn, as it had to be for "puffing." In that phase there was no suction at the end of the "tube," but probably some back-flow, though obviously not enough to counteract the increased air-flow through the needle. However, this modification of the old devices we need not count in holding that Wenczel made an invention; it was because he selected for an old need—quilting—a theretofore unused device that we think he showed more than ordinary insight, else it would have been made before.

However, upon the issue of invalidity the defendant relies less upon prior patents than upon the prior use by Haas. Haas at some time undoubtedly did invent a "puffing machine" designed to perform the same work as plaintiff's machine. Further, his first "puffer" (Exhibit C) was substantially the same as the plaintiff's; and, if it had been properly proved, it might be hard to support the patent. However, not only was there no evidence as to the date of it except the word of Haas and his wife—who knew incidentally nothing of its construction—but again and again, Haas spoke of it as an unsatisfactory temporary device which he had discarded before he began to do any business. It must certainly be considered an abandoned experiment and is therefore immaterial. Haas also testified that in the autumn of 1929 he invented another "puffer" (Exhibit D) in general structure like the first, except that there was no means—as in Wenczel's machine— to vary the air pressure by changing the position of any member like the "tube, 40." The plaintiff insists that for this reason it cannot anticipate, and literally that is true; but possibly, if it could be deemed a part of the prior art, the step between it and Wenczel's disclosure would not justify a monopoly. Besides, claim one does not incorporate the "regulating valve," i. e., the "tube, 40." We need not, however, pass upon this question, or indeed whether the evidence of its date of production satisfied the exacting standard set by the Barbed Wire Patent Case, 143 U.S. 275, 12 S.Ct. 443, 450, 36 L.Ed. 154, for it is clear that it was never in prior "public use," and that Haas was not a "first inventor." It was always kept as strictly secret as was possible, consistently with its exploitation. In general, everybody was carefully kept out of Haas' shop where the four machines were used. He testified that "no one was allowed to enter but my employees," girls he had had "for years"; and that he "had instructed my girls that if anybody should ask to get any kind of information simply tell them you don't know. In fact I have my shop door so arranged that it could only be opened from the inside." He also enjoined secrecy on his wife who testified "no one ever got into the place and no one ever saw the machine. He made everything himself." Indeed, as a condition upon even testifying in the case at bar Haas insisted, and the judge ordered, that the lawyers should be sworn to keep secret all he said about the construction of the "puffer," and that it should not be printed in the record, but typed and sealed for the inspection of the judges alone. It does not appear that the "girls" knew how the machines which they used were made, or how they operated. The only exception to this was a disclosure, such as it was, to two members of a firm going by the name of the Bona Fide Embroidery Co.—Custer and Kadison. In the same autumn of 1929 they and Haas testified that they had seen some of his

quilting and were anxious to get the whole of his output. They went to his shop to satisfy themselves; Custer said that "it was very vital at that time that I should know the workings of the machine for my production of the proper designs." (By "workings" he could only have meant how it performed for he never learned its construction.) After this visit the two agreed that Haas should give them his whole production and that they should sell it; they even talked about taking out a patent, but did not have the necessary money. Thus, Haas kept his machine absolutely secret from the outside world except to secure selling agents for its product, and then it was only its performance, not its construction that even they learned. Moreover, Custer and Kadison had the same motive to suppress whatever information they got that Haas had, for without a patent the secret was all that protected their market.

■■■■ Such a use is clearly not a "public" one, and such an inventor is not a "first inventor." In Gayler v. Wilder, 10 How. 477, 481, 497, 13 L.Ed. 504, the question was whether the condition—which has always been in the statute—that the patentee must be the "first and original inventor" was defeated by anyone who had earlier conceived the same invention, or only by one who had also in some way made public his results. A majority of the court held that only the second would defeat a patent on the ground that what had not in fact enriched the art, should not count; and the doctrine is now well fixed. Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651. Just as a secret use is not a "public use," so a secret inventor is not a "first inventor." Acme Flexible Clasp Co. v. Cary Mfg. Co., C.C., 96 F. 344; Diamond Patent Co. v. S. E. Carr Co., 9 Cir., 217 F. 400, 404; A. Schrader's Sons v. Wein Sales Corp., 2 Cir., 9 F.2d 306; Peerless Roll Leaf Co. v. H. Griffin & Sons Co., 2 Cir., 29 F.2d 646. Haas' user was one where "the machine, process, and product were not well known to the employes in the plant," and where "efforts were made to conceal them from anyone who had a legitimate interest in understanding them," if by "legitimate interest" one means something more than curiosity or mischief. Electric Battery Co. v. Shimadzu, 307 U.S. 5, 20, 59 S.Ct. 675, 684, 83 L.Ed. 1071. In E. W. Bliss Co. v.

Southern Can Co., D.C., 251 F. 903, 908, 909, affirmed 4 Cir., 265 F. 1018, although people were kept out of the factory, the exclusion was not, as in Haas' case, directed to the secrecy of the supposed anticipation.

■■■ We are to distinguish between a public user which does not inform the art (Hall v. Macneale, 107 U.S. 90, 97, 2 S.Ct. 73, 27 L.Ed. 367) and a secret user; some confusion has resulted from the failure to do so. It is true that in each case the fund of common knowledge is not enriched, and that might indeed have been good reason originally for throwing out each as anticipations. But when the statute made any "public use" fatal to a patent, and when thereafter the court held that it was equally fatal, whether or not the patentee had consented to it, there was no escape from holding—contrary to the underlying theory of the law—that it was irrelevant whether the use informed the public so that they could profit by it. Nevertheless, it was still true that secret uses were not public uses, whether or not public uses might on occasion have no public value. Perhaps it was originally open to argument that the statute merely meant to confine prior "public uses" to the prospective patentee and to be evidence of abandonment, and that "first inventor" meant to include anyone who first conceived the thing in tangible enough form to be persuasive. But, rightly or wrongly, the law did not develop so, and it is now too late to change. Hence the anomaly that, by secreting a machine one may keep it from becoming an anticipation, even though its public use would really have told nobody anything about it.

The defendant next says that the disclosure is inoperative, because in the drawings the "tube, 40," is shown (figure 3) as partially telescoped into the needle; the starting position for threading, but not the proper one for "puffing." The disclosure does not indeed contain any express instruction that one should withdraw the "tube" while "puffing"; though the figures alone showed that the "tube" was meant to move horizontally, and that could only have been to control the airflow. But one was not left to the figures, because the text declared that the "passage of air" could be so "regulated, and thus control the speed at which the thread or yarn is fed through the injector tube" (p. 2, ll, 44–51). It was not necessary to say

that the device does not thereafter operate by suction; all that specifications need ever do is to show how to exploit the invention. That was done.

These are the only points which touch the validity of the patent. Several of the other objections require only passing comment. As to the plaintiff's title, the only defect claimed is that possibly it may not be in the three plaintiffs, but only in two of them. Rule 21, Rules of Procedure, 28 U.S.C.A. following section 723c, answers this objection. As to the plaintiffs' release of one of the alleged infringers, Bialor, after the action was brought, the document was not a release, but an agreement not "to bring suit," and, under the law of New York where it was made, it had no effect upon the liability of the defendant, Stern. Gilbert v. Finch, 173 N.Y. 455, 66 N.E. 133, 61 L.R.A. 807, 93 Am.St.Rep. 623; Walsh v. New York Central R. R., 204 N.Y. 58, 97 N.E. 408, 37 L.R.A.,N.S., 1137. The issue of non-infringement is frivolous.

There remains only the question of whether the plaintiffs' conduct has taken away their right to equitable relief. This rests upon the fact that in a trade journal they advertised that the Supreme Court had held that the infringing user of a patented machine was liable to the same damages as a manufacturer, and that "the court" (not necessarily the Supreme Court) had given them the right to "confiscate and destroy" machines in the hands of a user, and to recover the profits made by their use, and the damages suffered by the patentees, "together with our costs and disbursements." Alongside this notice was the reproduction of three news items: one, that the user of an infringing machine had been fined $25 for contempt of a consent decree enjoining his use of it; another, that a consent decree had been entered against another user; and last, that action had been brought against a third user. The plaintiffs also distributed to the trade a post-card, saying that the district court had enjoined infringement of the patent. They had in fact obtained two consent decrees, but the patent had never been really adjudicated, and the post-card did give to laymen the impression of a judicial countenance of the invention which the facts did not warrant. As to the first statement, although it may have been misleading to say that a user is as liable as a maker, any such implication was corrected by saying later that he was liable for damages and profits, which he is. Moreover, curiously enough, in Birdsell v. Shaliol, 112 U.S. 485, 487, 5 S.Ct. 244, 245, 28 L.Ed. 768, Justice Gray declared that an infringer "may, in addition to the payment of damages for past infringement * * * when the whole machine is an infringement * * * be ordered to deliver it up to be destroyed." It must be owned that—at least in this country—that statement stands alone; and we do not mean to suggest that actually that remedy is now available, and, moreover, no court had in fact given them power to confiscate infringing apparatus. Undoubtedly they did, therefore, make some untrue statements; but equally without doubt their importance was very trivial.

The defence is rather a scurvy one at best, and we are not inclined to lend it an auspicious ear in the case at bar. Of course, a person seeking a court's aid may have so conducted himself that his case seeks too much for any court to entertain it (Keystone Driller Co. v. Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293) no matter from whom it learns the facts. But ordinarily that is not so; ordinarily he has merely made some venial misstatement which influences nobody; then the defence sits especially ill in the mouth of one who is himself an offender, and who seeks by recrimination to continue his invasion of the other's rights, and to avoid restitution. Particularly in actions on patents it has become the favorite gambit of infringers; they pick over the patentee's advertisements—often, it is true, not drawn with scrupulous nicety, as advertisements seldom are—and find, as they frequently can, departures from the untarnished truth. These ought not to give them their escape. No doubt it would be desirable to repress the exuberance of over-statement by which so much of our marketing is done, and there are tribunals charged with that duty; but we are not disposed to give the initiative to those who are themselves preying upon the delinquents, at least so long as the delinquency is confined to such trifling misconduct as was shown in this case. Art Medal Works v. Abraham & Straus, 2 Cir., 107 F.2d 944.

The judgment is reversed and the usual judgment will be entered for the plaintiffs on all claims. The counterclaim will of course be dismissed.