An Order will be entered in accordance with this Opinion.

**MAGNETICS, INC., Plaintiff,**

v.

**The ARNOLD ENGINEERING COMPANY and Allegheny Ludlum Steel Corporation, Defendants.**

**No. 67 C 635.**

United States District Court,
N. D. Illinois, E. D.

Aug. 28, 1969.

---

31. 189 F.Supp. 12, 18–19.

Frank W. Fowle, Chicago, Ill., and Paul T. O'Neil and Raymond N. Baker, Shanley & O'Neil, Washington, D. C., for plaintiff.

Dugald S. McDougall, and Robert L. Kahn, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

DECKER, District Judge.

In this patent infringement suit, Magnetics, Inc. seeks to enforce Eyberger reissue patent 25,441, Eyberger patent 3,244,782 and Brandon patent 3,011,213. The two Eyberger patents describe, respectively, the apparatus and the method for compressing magnetizable toroidal (doughnut-shaped) cores from powdered metal particles. The Brandon patent describes a lubricating machine used with the die pressing apparatus.

The Arnold Engineering Company and its parent corporation, Allegheny Ludlum Steel Corporation, are alleged infringers. Plaintiff concedes that Allegheny is entitled to judgment in its favor. Arnold admits infringing most of the asserted claims; it relies primarily on two invalidity defenses: obviousness and prior public use.

The cores produced under the patents are used principally in telephone equipment. Thus, the Western Electric Company conducted the pioneer research in the area and continues to dominate the field. Since about 1950, however, several satellite companies have been established, including Arnold and Magnetics.

After discussing the patents' background, this opinion will analyze whether they were obvious to one ordinarily skilled in the art. Next, the opinion will discuss whether the inventions were used publicly more than one year before the patent applications were filed. Finally, the few contested infringement issues will be resolved.

## I. BACKGROUND

The parties agree that the two Eyberger patents are indistinguishable insofar as they relate to this litigation; they will therefore be characterized as a single invention. The molding die described by Eyberger consists of three main parts: a one-piece solid die, a center post, and a pressure ring. The die and the pressure ring are shaped to form complementary sections which together mold the outside surfaces of the core ring. The center post creates the opening in the middle of the core. The Brandon lubricating patent covers a spray gun which is mounted above the die molds. The gun automatically sprays fluid onto the die walls when a mold is advanced to the lubricating station.

Prior to about 1954, toroidal cores were normally pressed on segmented dies which employed three sections to form the bottom portion of the mold's

outer wall. There was also a center post and a press. In contrast, the solid dies now in controversy utilize a one-piece mold (plus a center post and a press), thereby facilitating automation.

In 1954 one of Western Electric's experienced engineers, Richard B. Graf, was directed to design a one-piece die. In earlier attempts to construct solid dies, core rings had often been deformed or laminated by the sudden release of high pressure, thus causing non-uniform density. Graf designed a die with uniformly tapered walls. As the core was lifted from the mold, the cavity's slowly increasing size allowed the lateral pressure to be decreased gradually.

The solid die's uniformly outwardly tapered walls, as developed by Graf in 1954, were the only novel feature of the Eyberger patents which were applied for on May 17, 1957. All other aspects of the invention were old in the art.

With Western Electric's permission, Graf left that company in 1955 to join Arnold. Continuing his solid die work, Graf further developed the various tooling, presses and other equipment necessary for an automated operation. In early 1956 Graf constructed a lubricator to coat the mold with a thin film of oil before the metallic powder was added. The lubricating mechanism constituted the exact invention covered by the Brandon patent applied for on February 19, 1958.

Neither Graf, nor Western Electric, nor Arnold sought patents on the solid die or the lubricator. With respect to the die mold, Western Electric's patent department ruled that "there is insufficient patentable novelty to warrant the filing of an application."

## II. OBVIOUSNESS

At trial Graf testified that, when he conceived each of the inventions, they were obvious to one ordinarily skilled in the art.[1] See Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L. Ed.2d 545 (1966). Magnetics failed to produce any witnesses to support its patents, relying exclusively upon the statutory presumption of validity.[2]

■ Entitled "Powder Metallurgy," Moore patent 2,481,232 explains how a disc shaped core can be pressed without deformation or lamination; uniformly tapered walls are employed to release slowly the lateral pressure.[3] Moore thus teaches both the apparatus and the method covered by the Eyberger patents.[4]

Magnetics emphasizes two differences between its patents and Moore. First, in Moore the axial pressure is reduced by ninety percent; then, the relative movement of the disc and the mold begins to diminish the lateral pressure. Eyberger removes all axial pressure before relative movement begins. Second, Moore's final product is a sold disc rath-

1. Graf was eminently qualified as an expert, having had extensive experience with magnetizable toroidal cores at Western Electric and Arnold. Magnetics apparently concedes Graf's excellent credentials.

   In addition to Graf, two other Western Electric engineers, Joy Dillinger and S. Colvin, were typical of those ordinarily skilled in the art.

2. On cross-examination, Magnetics did not even challenge Graf's testimony that the solid die patents were obvious.

3. When processing the Eyberger patents, the Patent Office did not cite the Moore prior art patent. The statutory pre-

sumption of validity is therefore inapplicable. See, e. g., Novo Industrial Corp. v. Standard Screw Co., 374 F.2d 824, 827 (7th Cir. 1967).

4. The Patent Office itself declared that: "To broadly recite that the walls of the die cavity were tapered would not amount to invention in view of the secondary references which show this feature to be old in the art."
   Nevertheless, the examiner approved the application, apparently believing there was novelty in the detailed list of elements comprising Eyberger's combination patents. At trial plaintiff failed to demonstrate any novelty in its solid die patents other than the tapered walls.

er than a toroidal ring. As explained by Graf, however, these distinctions were insignificant. Unlike disc shaped compacts, toroidal cores do not require the retention of ten percent of the axial pressure; the reduction from Moore's ninety percent to Eyberger's one hundred percent was an obvious variant.[5] The exact shape of the core was also unimportant, depending merely upon the particular design of the mold.[6]

Similarly, the Brandon patent closely resembles Begley patent 1,924,018. The latter reference describes apparatus for lubricating toroidal dies used to mold automobile tires. As in the Brandon patent, the prior art spray gun was constructed so that lubricating fluid was automatically squirted into the cavity when a dry mold was advanced to a designated position.

There are only two differences between the Begley and Brandon patents. Since tire molds are much larger than the dies in question, the earlier lubricator was mounted at about a forty-five degree angle. By rotating around a fixed point, it reached all surfaces of the mold. On the other hand, the instant spray gun is positioned vertically. To lubricate the entire die, the mechanism moves in a small circle. Therefore, the differences are (1) the angle of the lubricator (45° versus 90°), and (2) the movement of the device (rotation around a point versus movement in a circle.[7] As stated by Graf, these distinctions were obvious at the time of Brandon's invention to one ordinarily skilled in the art. Any high school physics student would have known that the angle and the movement of a lubricator can easily be adjusted, to compensate for changes in the size of a die mold.[8]

## III. PUBLIC USE

Under 35 U.S.C. § 102(b), a person may not obtain a patent if "the invention was * * * in public use * * * more than one year prior to the date of the application for patent." Compare Cloud v. Standard Packaging Corp., 376 F.2d 384, 389–390 (7th Cir. 1967). Graf perfected and reduced to practice each of the contested inventions more than one year before Eyberger and Brandon applied for patents.[9] Furthermore, Western Electric and Arnold used Graf's die molds to manufacture thousands of core rings which were sold commercially to their customers.

Magnetics characterizes the core production as "experimental" and "con-

---

5. Eyberger simply omitted a portion of the Moore invention. Each element retained by Eyberger, moreover, performed the exact function employed in the prior art reference. Compare Richards v. Chase Elevator Co., 159 U.S. 477, 486, 16 S.Ct. 53, 40 L.Ed. 225 (1895); Anderson v. Phoenix Products Co., 226 F.2d 191, 193 (7th Cir. 1955).

6. Compare Deep Welding, Inc. v. Sciaky Bros., Inc., 417 F.2d 1227, 7th Cir., August 13, 1969:
"[W]hile it is preferable that 'all of the elements of the patented device or their equivalents * * * be found in a single prior device,' it is sufficient for anticipation 'if the general aspects are the same and the difference in minor matters is only such as would suggest itself to one of ordinary skill in the art.' Amphenol Corp. v. Gen'l Time Corp., 397 F.2d 431, 437–438 (7th Cir. 1968)."

7. When cross-examining Graf, plaintiff did not mention the second difference. Its inclusion in Magnetics' brief appears to be an afterthought.

8. Although the Patent Office cited the Begley reference, Arnold has overcome the statutory presumption of validity by clear and convincing evidence. Compare Murdock v. Vaughan Novelty Mfg. Co., 131 F.2d 258, 259 (7th Cir. 1942), with King-Seeley Thermos Co. v. Tastee Freez Industries, Inc., 357 F.2d 875, 879 (7th Cir. 1966).

9. To illustrate, in its post-trial brief, Magnetics declared that:
"Plaintiff admits that the foregoing testimony of Mr. Graf, if true, would establish that the operation of the Elmes press [in 1955] was a reduction to practice of the inventions defined by claims of Re. 25,441 and 3,244,782."

cealed."[10]  Thus, the parties' primary controversy is whether the inventions were used "publicly." In Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 20, 59 S.Ct. 675, 83 L.Ed. 1071 (1939), the Supreme Court defined "public use" as follows:

"A mere experimental use is not the public use defined by the Act, but a single use for profit, not purposely hidden, is such. The ordinary use of a machine or the practice of a process in a factory in the usual course of producing articles for commercial purposes is a public use."

Having perfected the solid die by September 1954, Graf and his superiors knew that it was practical. They were no longer experimenting with the invention. But investment in equipment necessary to construct a fully automated process, such as automatic multiple station presses, would cost about $125,000, thus requiring the approval of Western Electric's board of directors. To demonstrate convincingly the cost economies of such a large investment, an extensive quantity of acceptable cores needed to be produced.[11] The necessary tooling was assembled on a single station Denison press borrowed from the Ferrite Department. Between October 1954 and mid-1955, thousands of consistently good quality cores were pressed on one-piece dies by ordinary shop personnel. After being subjected to regular production tests, the cores were shipped to the company's customers.

No attempts were made to hide the operation from other employees or persons. Information about the project was given to suppliers, such as the Denison Engineering Company.[12] Arnold's personnel were also told about Western Electric's activities. Rather than being concealed, the core production was conducted openly.[13]

10. Plaintiff also contends that the core production did not utilize the patent's invention because the pressure ring was not mounted on a punch above the die cavity. Magnetics maintains that a loose pressure ring is therefore distinguishable. But, the mechanical construction of the press and the pressure ring was old in the art. Prior public use would thus not require the exact arrangement described by Eyberger.

Furthermore, Graf's testimony and his January 21, 1955 memoranda establish that a punch with attached pressure ring, as specified by the Eyberger patents, was used on the Elmes press at Arnold and on the single station Denison press at Western Electric. Extensive quantities of acceptable cores were produced on both of these presses more than one year before Eyberger's filing.

11. Compare Atlas v. Eastern Air Lines, Inc., 311 F.2d 156, 162 (1st Cir. 1962): "[W]e fully agree with the district court that: 'There was no question involved of seeing whether the device worked or how it could be improved. Such experimentation as was to be made had been completed.'"

12. Denison manufactured the multiple station press ordered for the automated production.

In an attempt to sell its wares, a supplier sometimes discloses information received from its customers.

After substantial experimentation in the first part of 1956, Eyberger had been unable to develop a workable solid die. In July 1956 Eyberger was directed to "investigate Denison press set up with indexing table similar to the ones they have made for Western Electric and Arnold for use in making powder cores in our plant." Among the items to be checked were the following:

"Determine the method of lubricating the dies before filling with powder."

"Obtain an estimate of expected die life."

"Determine the production rate of the machine."

"Determine the accuracy with which the press will repeat  *  *  *"

Shortly after his visit with the Denison personnel, Eyberger "invented" a solid die which was identical to the one developed by Graf. Eyberger then applied for a patent.

13. Western Electric's operation contrasts sharply with the concealment practiced in Gillman v. Stern, 114 F.2d 28, 31 (2nd Cir. 1940):

"Haas' user was one where 'the machine, process, and product were not well known to the employes in the plant,' and where

Similarly, during November and December 1955 a single station Elmes press at Arnold utilized solid dies to produce commercial cores. An automatic, multiple station Denison press had been ordered. Pending its arrival, Graf and other personnel used the extensive production runs to test the tooling and accessory equipment.

From May 1956 through July 1956, the new Denison press was first operated at Arnold, utilizing a lubricating device which automatically sprayed the die molds. Designed by Graf, the lubricator was identical to the invention described in the Brandon patent. Thousands of salable core rings were produced with the aid of the lubricator.

Arnold's 1955–1956 core production was executed by ordinary shop personnel. After normal testing, the toroidal rings were sold to its regular customers.

No attempts were made to conceal the commercial production.[14]

█ In conclusion, from 1954 through the first part of 1956, Western Electric and Arnold employed the invention described in the patent application submitted by Eyberger on May 17, 1957. Moreover, in 1956 Arnold utilized extensively the lubricating invention discussed in the Brandon patent application filed February 19, 1958. Such commercial production constituted prior "public use" of plaintiff's patents. See 35 U.S. C. § 102(b); Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 20, 59 S.Ct. 675, 83 L.Ed. 1071 (1939). *Compare* Shimadzu v. Electric Storage Battery Co., 17 F.Supp. 42, 47–49 (E.D.Pa. 1936).[15]

█ All three of the patents are therefore invalid.

'efforts were made to conceal them from anyone who had a legitimate interest in understanding them,' if by 'legitimate interest' one means something more than curiosity or mischief."

14. In support of its concealment allegations, Magnetics relies heavily upon employee contracts which Graf and similar personnel executed while at Western Electric, agreeing not to disclose "secret or confidential knowledge." Arnold and Western Electric also agreed that the former would "take suitable precaution against unauthorized use or disclosure" of technical information acquired from Western Electric.

There is no indication, however, that Western Electric considered the solid die work to be "secret or confidential." Moreover, plaintiff has failed to demonstrate that these contracts had any practical impact on the commercial operations now in question. As described above, the core production at the two companies was conducted without restriction. In fact, Graf recalled showing dies to guests brought through the Arnold plant by the company's president.

15. Plaintiff cites Gayler v. Wilder, 51 U.S. (10 How.) 477, 13 L.Ed. 504 (1850), for the proposition that "public use" must be readily accessible to the public. But the invention in *Gayler*, a fireproof construction for chests and safes,

was concealed because its value was unrecognized by the alleged prior inventor. As described by the Supreme Court: "[A]lthough Conner's safe had been kept and used for years, yet no test had been applied to it, and its capacity for resisting heat was not known; there was no evidence to show that any particular value was attached to it after it passed from his possession, or that it was ever afterwards used as a place of security for papers; and it appeared that he himself did not attempt to make another like the one he is supposed to have invented, but used a different one." 51 U.S. (10 How.) 497.

Moreover, in Gillman v. Stern, 114 F.2d 28, 31 (2nd Cir. 1940), Judge Learned Hand analyzed the statute as follows: "[W]hen the statute made any 'public use' fatal to a patent, * * * there was no escape from holding—contrary to the underlying theory of the law—that it was irrelevant whether the use informed the public so that they could profit by it. * * * Hence the anomaly that, by secreting a machine one may keep it from becoming an anticipation, even though its public use would really have told nobody anything about it."

See also Randolph v. Allis-Chalmers Mfg. Co., 264 F.2d 533, 535 (7th Cir. 1959). But *cf.* Minneapolis-Honeywell Regulator Co. v. Midwestern Inst., Inc., 298 F.2d 36, 38 (7th Cir. 1961).

## IV. INFRINGEMENT [16]

In the early 1960's, Arnold and Magnetics independently discovered that the mold's useful life could be significantly extended if the die body were sliced into two pieces along a horizontal plane. Thereafter, Magnetics obtained the reissue patent, adding claim 11 in which the patent's language is not restricted to a solid die.[17]

■ Magnetics now asserts that Arnold's two-piece dies infringe reissue claims 1, 2, 7 and 11. Eyberger's reissue patent is based, however, upon patent 3,063,098 in which the designs, specifications, and claims were all limited to a solid die body. The fabrication of a die from one piece of material was an essential part of both patents' inventive concept, thus precluding infringement by two-piece molds. See, e. g., Ric-Wil Co. v. E. B. Kaiser Co., 187 F.2d 1, 3 (7th Cir. 1951); Flowers v. Austin-Western Co., 149 F.2d 955, 959 (7th Cir. 1945).

■■ Furthermore, with respect to claim 11, a reissue patent cannot be expanded to cover something which is neither disclosed in nor intended to be covered by the initial patent. See, e. g., United States Industrial Chemicals Inc. v. Carbide Corp., 315 U.S. 668, 675, 62 S.Ct. 839, 86 L.Ed. 1105 (1942). As for claims 1, 2 and 7, plaintiff invokes the doctrine of equivalents, even though these claims are explicitly limited to "one-piece" dies. Compared with the

patent, the accused structures have no identity of means because two-piece molds last substantially longer than one-piece dies.

Accordingly, the reissue claims are not infringed by Arnold's two-piece die molds.

## V. CONCLUSION

All three of the contested patents are invalid. At the time of the patentees' conception, the Eyberger and Brandon inventions were obvious to one skilled in the art. The level of ordinary skill included an awareness of the Moore and Begley prior art references, as well as the facility to make the minor changes necessary to adapt these earlier patents to small toroidal die molds.

Moreover, the inventions were in public use more than one year prior to the filing of the patent applications. One-piece solid dies were employed at the manufacturing plants of both Western Electric and Arnold. Brandon's lubricating mechanism was used by Arnold on its multiple station Denison press.

If the patents were valid, Arnold's accused devices would infringe only the claims specified in the parties' stipulation. Arnold's two-piece molds would not infringe the reissue patent because its claims are restricted to solid, one-piece dies.

Defendant shall prepare and submit an appropriate judgment order within ten days. Neither side will be awarded attorneys' fees.

---

16. The parties have stipulated that: (1) defendant's one-piece dies infringe claims 1, 2, 7 and 11 of Eyberger reissue patent 25,441, (2) the method used by Arnold in making its toroidal cores infringes the claims of Eyberger patent 3,244,782, (3) defendant's lubricating apparatus infringes the claims of Brandon patent 3,011,213, and (4) claims 1, 2, 7 and 11 of the reissue patent read literally upon Arnold's two-piece dies, except insofar as

claims 1, 2 and 7 specify single-piece construction.

17. Claim 1 defines the solid die as "including a single piece of rigid material," whereas claim 11 characterizes the die as "an insert." Eyberger did not indicate to the Patent Office that the purpose of the reissue patent was to avoid the original patent's limitation to one-piece dies.