The **INTERNATIONAL GLASS COM-
PANY, Inc.**
v.
The **UNITED STATES.**
No. 62–65.

United States Court of Claims.
March 14, 1969.

Marvin Usdin, New York City, attorney of record, for plaintiff.

Howard B. Rockman, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner James F. Davis with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on July 23, 1968. Plain-

tiff, while accepting the presentation of facts in the report of the commissioner as being correct and proper, filed exceptions to the commissioner's opinion and recommended conclusion of law. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF COMMISSIONER

DAVIS, Commissioner:

This is a patent suit under 28 U.S.C. § 1498 to recover "reasonable and entire compensation" for alleged unauthorized use for the Government of plaintiff's patented invention. Only the issue of liability is before the court; accounting, if any, is deferred to later proceedings. Plaintiff contends that claims 1–4 and 6 of its patent are infringed by Boeing Aircraft Company (hereafter "Boeing") and Rohr Corporation (hereafter "Rohr"), both of which made airplane parts for defendant within the statutory recovery period.

The issues before the court are patent validity under 35 U.S.C. §§ 102 and 103 and patent infringement. In particular, defendant contends that claims 1–4 are invalid under sections 102(g) and 103; that claims 1 and 3 also are invalid under section 102(a) or (b); and that claim 6 is not infringed.[1]

*Patent in suit*

The patent in suit, issued in 1953 to plaintiff and entitled "Mounting Method," relates to method and apparatus for holding workpieces, such as gem stones, to a work station for treatment, such as grinding, polishing or buffing. In es-

---

1. Defendant. in its first amended answer to plaintiff's petition, pleaded as a further defense that "the Government has not authorized or consented" to use by Boeing and Rohr of the alleged infringing process. 28 U.S.C. § 1498, second paragraph. Defendant before trial withdrew this defense.

sence, the workpiece is frozen to the station. The patent specification says (emphasis added):

> This invention is concerned with a method for temporarily mounting work pieces, *particularly of minute dimension, and hence, difficultly manageable,* for application of treatments requiring exposure of at least some of the surfaces of the work. The invention is particularly useful in connection with the grinding and polishing or buffing of materials such as glass, plastics and/or metal in the manufacture of ornamental and industrial jewels, imitation stones, lens, beads, bearings, buttons and the like.

\* \* \* \* \* \*

> Work to be treated is bonded in accordance with this invention to a work support with a low temperature bond induced by interposing a film of a material which is liquid at normal room temperatures, preferably water, between the work piece and work support and freezing the liquid into an ice bond, if it be water, which is maintained during manufacturing operations performed on remaining exposed surfaces of the work. *The work is quickly released merely by melting the ice bond by application of heat.*

\* \* \* \* \* \*

> While water or any aqueous vehicle is the most inexpensive and satisfactory bonding material for use in my invention, I do not exclude the use of other materials, liquid at normal room temperatures and having freezing points at or above about 32° F., for example, acetic acid, benzol, glycerine, and some of the relatively high freezing point oils.

\* \* \* \* \* \*

One embodiment of an apparatus for practicing the invention (illustrated and described in finding 5) comprises a metal rod, called a dopstick, mounted in a housing. The rod has a conical-shaped depression, or dop,[2] at its lower end for re-

ceiving a gem stone. A refrigerant chamber surrounds the lower part of the dopstick; the upper part is offset like a crank handle for rotation by an indexing device to turn the workpiece. In operation, before a gem stone is mounted at the end of the dopstick, water is sprayed onto the surface of the conical recess. With the stone inserted, refrigerant is circulated through the housing. Since the dopstick is metal, a good heat conductor, the water is frozen quickly and the stone secured in place. The stone is buffed or polished by an abrasive belt, then the dopstick is rotated, thereby to expose the stone's different facets for treatment. Thereafter, the ice bond is thawed either by passing warm fluid through the refrigerant chamber or by applying "localized" heat to the ice bond. The stone is then turned over and refrozen into place or another stone inserted.

The only apparatus disclosed in the patent specification for applying "localized" heat is a "high frequency coil" into which the lower end of the dopstick is mounted. When energized the coil heats the dopstick. By applying "localized" heat, rather than discontinuing refrigerant flow and warming the refrigerant chamber, a workpiece can be released quickly, turned or replaced, and refrozen without interrupting the refrigeration process. According to the patentee, this technique, as opposed to warming the refrigerant chamber, is "more efficient," is preferred, and is the subject of claim 6, later discussed in detail.

The patent has 11 claims, both to apparatus and method. Only claims 1–4 and 6, all to method, are in issue. Claims 1 and 6, set out below in outline form, are representative:

> 1. The method of temporarily rigidly mounting difficultly manageable work-pieces on supports for application of precision treatments to exposed surfaces of the mounted work-pieces which comprises

---

2. Webster's New International Dictionary (1948 ed.) defines "dop" thus: "a little cup in which a diamond is held while being cut."

interposing a material which is liquid at normal room temperature between and in contact with a work-piece and a work-receiving surface of a work-support at a temperature not substantially exceeding normal room temperature, and

withdrawing heat from said liquid at least in part by conduction through said support until said liquid is frozen at a temperature below room temperature, and forms a rigid work-piece-to-support frozen bond and thereafter

treating an exposed surface of the work-piece while maintaining the temperature of said bond below the freezing point of said material.

6. The method of temporarily rigidly mounting difficultly manageable work-pieces on supports for application of precision treatments to exposed surfaces of the mounted work-pieces which comprises

circulating a refrigerant in heat exchanger relation with the support to maintain the temperature of a work-receiving surface of the support normally below room temperature,

applying heat locally to said surface to raise its temperature at least momentarily while interposing a material which is liquid at normal room temperature and has a freezing point above the maintained temperature of said surface, between and in contact with a work-piece and said surface, and then

discontinuing the application of said heat to freeze said liquid on said chilled work-receiving surface and form a rigid work-piece-to-support frozen bond and

treating the exposed surfaces of the work-piece while maintaining the temperature of said bond below the freezing point of said material.

Claim 3 is similar to claim 1 but specifies the "liquid" as "water" and states that the temperature of the bond is maintained "below 0° C." which is the freezing point of water. Claims 2 and 4 are similar to claims 1 and 3, respectively, but add as a final step "breaking the bond by applying heat" to thaw the ice.

Plaintiff introduced no evidence at trial that the patented apparatus and method were ever used by the jewelry industry, nor that a license was ever granted under the patent, though plaintiff, without success, solicited licenses from several companies in various industries, including the aircraft industry. The patent is thus a "paper patent," a fact having significance to the breadth to be given its construction. American Cyanamid Co. v. Hercules, Inc., 260 F.Supp. 368, (D.Del.1966); IV Walker, Patents § 229 (Deller's 2d ed. 1964).

*The alleged infringing process*

The process used by Boeing and Rohr and alleged to infringe is the so-called "ice chuck" process for machining honeycomb material.

Honeycomb, as the name implies is an open-celled structure with thin aluminum or steel walls, about 0.001 to about 0.005 inches (1 to 5 mils) thick. Honeycomb is strong in compression in the direction parallel to the cell walls and is very light per unit volume. It is therefore a useful support filler to sandwich between upper and lower surfaces of airfoils, such as helicopter rotor blades. Honeycomb comes in pieces about 5 feet long and several inches thick. Before useful as filler, the pieces must be shaped by machining to the contour of the airfoil. Machining is difficult, however, since honeycomb is fragile and the cell walls are easily torn or deformed by usual grinding or cutting. Also, pieces cannot be anchored as in usual machining operations e. g., by clamps, without damaging cell walls.

The ice-chuck method is a solution to difficulties of machining honeycomb. Boeing's method in essence is to fill up the honeycomb with water, freeze it solid to a work platform, then machine the frozen block to proper contour. The block is then thawed, the honeycomb piece turned over, and the process repeated. The final honeycomb piece thus has

the proper shape for airfoil filler. In short, Boeing's method does two things: It secures the honeycomb to a work platform, thus solving the clamping problem; and the ice which fills all the cells of the honeycomb supports the cell walls during machining to prevent tearing or distorting.

To practice its process Boeing uses a so-called bonding mill fixture which comprises a portable flat-bottom tub with removable end walls which sits on a refrigerated base. Honeycomb to be machined is put in the tub which is filled with water to inundate the honeycomb, then put into a freezer and frozen to make a honeycomb-ice block secured to the bottom of the tub by the ice. The tub is put on the refrigerated base; and after removing the end walls, the top surface of the frozen block is machined with a rotary mill cutter to desired contour. Refrigerant is circulated through the bonding mill base beneath the tub during machining. After machining, the block is thawed, the honeycomb turned over and the process repeated to shape the other side.

Rohr's ice-chuck process is described in U.S. Patent No. 3,083,002, to E. M. Lacey, Jr., issued March 26, 1963, assigned to Rohr Corporation. It differs from Boeing's process in the following material respects: (a) the honeycomb is not fully submerged in water before freezing, but rather is covered by water only near its bottom; and (b) the water is frozen *in situ* at the bonding mill. Rohr's process is thus more like plaintiff's process than is Boeing's. Rohr, like plaintiff and unlike Boeing, freezes the water *in situ;* and Rohr, like plaintiff, uses ice solely to anchor the workpiece to the work station. Boeing, on the other hand, uses ice for the dual purpose of anchoring the honeycomb to the work station and supporting its cell walls during machining.[3]

Rohr's process is described in detail in finding 9, with reference to Lacey patent Fig. 2. In essence, Lacey discloses a holding chuck (like Boeing's bonding mill), having a base on top of which is mounted a horizontally slidable bed. A metal block atop the bed has a hollowed-out cavity at least ¼-inch deep into which a honeycomb workpiece is placed. The cavity is filled with water, thereby covering the lower part of the honeycomb. The depth of the cavity, and therefore the depth of water, depends on the size of the honeycomb piece to be machined. Larger pieces require greater water depth to get a secure bond when frozen. Honeycomb up to 2 inches thick requires ¼-inch water depth.

After the honyecomb and water are in place in the cavity, refrigerant is circulated through coils in the metal block to freeze the water. The honeycomb is machined by sliding the bed horizontally under a rotary cutter. To aid cutting, the upper part of the honeycomb is coated with a thick film of lubricant such as soap jelly, a concentrated soap-in-water mixture. Machining completed, hot gas, such as Freon used in the refrigeration system, is passed through the coils, the ice thawed and the honeycomb piece removed.

Plaintiff concedes that its patent specification does not expressly disclose honeycomb among the other workpieces to which its process and apparatus are applicable. And indeed honeycomb as a workpiece is very unlike gem stones in size and structure. However, plaintiff says the patent claims, properly construed, read on the Boeing and Rohr processes because honeycomb pieces are "difficultly manageable workpieces"; the honeycomb surfaces are given "precision treatment"; and in all other respects, the accused processes respond to

---

3. Despite significant differences between the accused processes, plaintiff considers them similar for purposes of deciding infringement. Though plaintiff draws no distinction between the processes on the basis of the extent to which honeycomb is covered with water prior to freezing, plaintiff does note that the Rohr process "includes, in addition to the step of Boeing, the withdrawal of heat, at least in part, by conduction through the support of the workpiece."

the method steps recited in the claims. For reasons below discussed, it is held that claim 6 is not infringed; and that claims 1–4, when construed sufficiently narrowly to avoid invalidity, are not infringed.

### Infringement of claim 6

■ Defendant does not challenge the validity of claim 6, but argues only noninfringement.[4] A patented process is infringed only by unauthorized performance of substantially the same process steps in substantially the same way to accomplish substantially the same result. It is not necessary that the accused process be practiced with the same or substantially the same apparatus as disclosed by the patentee. Tilghman v. Proctor, 102 U.S. 707, 730, 26 L.Ed 279 (1880). Nor is it necessary that the materials used in the process be identical to those disclosed and claimed as long as they are equivalent. Donner v. Sheer Pharmacal Corp., 64 F.2d 217, 223 (8th Cir. 1933). Plaintiff considers honeycomb equivalent to gem stones as "difficultly manageable workpieces" within the meaning of the claim even though the problems of securing and machining honeycomb are significantly different from securing and treating gem stones. I.e., gem stones are "difficultly manageable" because of their small size, while honeycomb is "difficultly manageable" because of its fragile structure. So, also, plaintiff considers cutting and milling honeycomb to be equivalent "precision treatment" to grinding, polishing or buffing gem stones.

Boeing's bonding-mill fixture and Rohr's holding chuck are materially different devices from the dopstick apparatus of the patentee. However, defendant does not contend that these differences alone avoid infringement, but rather contends that the accused ice-chuck processes do not meet the method-step limitations of the claim.

Claim 6 defines the patentee's "preferred" process, above noted, by which workpieces can be quickly secured, unsecured, then resecured to the work support. In essence, the work-receiving surface is maintained "normally" in refrigerated condition by continuously circulating refrigerant through the support; and heat is periodically and temporarily applied "locally to said surface to raise its temperature at least momentarily" by means of, e.g., radiant heat or a heat induction coil. During heating, water is "interposed" between the workpiece and the work surface, or an existing ice bond is thawed. When the workpiece is set in position for treatment, application of localized heat is discontinued and the work surface refreezes by virtue of refrigerant continuously circulating in "heat exchanger relation" to the work support.

Putting aside the questions of equivalency of gem stones to honeycomb, and cutting and milling honeycomb to grinding, polishing or buffing gem stones, plaintiff's case for infringement fails for the more fundamental reason that neither the Boeing nor Rohr processes meet the method-step limitations of claim 6. Neither process is concerned with rapid freezing and thawing of ice bonds. Thus in neither process is heat applied "locally" to the work surface within the meaning of the claim. In Boeing, work-surface temperature rises and ice bonds melt simply by discontinuing refrigeration of the honeycomb block, whereby the ice melts by exposure to ambient or room temperature. Indeed, plaintiff's expert admitted at trial that, in the patented process, "applying heat is a positive step, rather than the absence of refrigeration to limit temperature."[5]

4. In its answer to plaintiff's petition, defendant pleaded invalidity of all claims in issue. However, defendant requests no finding that claim 6 is invalid.

5. The testimony of Karl Ross, plaintiff's expert, that "applying heat is a positive step" was directed particularly to claim 2, which states as a final step "breaking the bond by applying heat to raise the temperature of the bond to substantially normal room temperature." Claim 6 says: "applying heat locally to said surface to raise its temperature." Since the patent specification discloses that the

There is no "positive" application of heat at any time in the Boeing process.

In the Rohr process, on the other hand, there is "positive" application of heat to raise the temperature of the work surface to melt ice bonds. However, such heat is applied by circulating "hot gas" through the cooling coils in place of refrigerant. This is not "local" application of heat within the meaning of the claim since refrigerant flow is necessarily discontinued while "hot gas" flows. Rohr uses neither radiant nor high frequency-induced heat, nor their equivalent, in its process. Thus, since the Boeing and Rohr processes leave out one of the series of acts which constitute the patented process, and do not substitute an equivalent act, infringement is avoided. Royer v. Coupe, 146 U.S. 524, 13 S.Ct. 166, 36 L.Ed. 1073 (1892).

■ In a word, therefore, the accused processes do not infringe claim 6 because they do not appropriate the gist of the claimed process; are not a mere variation of the details of the claimed process; and in fact do not substantially follow the mode taught by the patent. Universal Oil Products Co. v. Globe Oil & Refining Co., 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944).

*Validity and infringement of claims 1 to 4* [6]

A principal defense is that the accused ice-chuck process was used by others who did not abandon, suppress or conceal it before the patentee's invention was made. 35 U.S.C. § 102(g). Thus, so defendant argues, claims 1–4 are invalid; or, if not invalid, at least the claims must be construed so narrowly that infringement is avoided. The defense is based on testimony of Frank Sciaronni, a witness at trial, and on stipulated testimony of others, including one Kenneth Speck. Sciaronni, a die-

maker, was in 1946 superintendent of the experimental helicopter division, McDonnell Aircraft Corporation (hereafter "McDonnell"), St. Louis, Missouri. While working on construction of a helicopter blade, Sciaronni used a process, similar to the Boeing ice-chuck process, to machine honeycomb. Speck, a machine shop foreman at McDonnell, also used a similar process in 1950. The circumstances under which the process was used by Sciaronni and Speck are set out in full in findings 15 and 16 and are summarized here.

In July 1946, Sciaronni was asked by a McDonnell engineer, working on a helicopter project, to shape a piece of plastic honeycomb material to proper contour to fill a helicopter blade. Recognizing the difficulties of machining honeycomb, Sciaronni first tried filling the honeycomb, before machining, with cerrobend, a solder-like material which melts in hot water. Cerrobend and its properties were well known at that time. He machined the cerrobend-honeycomb block to proper contour, then removed the cerrobend by melting, leaving a properly shaped honeycomb piece. However, because of residual impurities of cerrobend left on the edges of the honeycomb, the honeycomb did not bond well to the top and bottom surfaces of the helicopter rotor blade when sandwiched therebetween.

About a week later, Sciaronni was again asked to machine a piece of honeycomb, this time aluminum rather than plastic. Recalling the problems of using cerrobend, Sciaronni decided to use frozen water rather than cerrobend to fill up the honeycomb. Sciarroni testified that he got the idea to use water from seeing rivets frozen to the bottom of a pan in a refrigerator at McDonnell. The rivets were frozen prior to use with a rivet gun to minimize crushing or de-

---

means for applying heat may be the same in the methods of claims 2 and 6, and the purpose is the same, the expert's testimony is just as pertinent to claim 6 as claim 2.

6. Though claims 1 and 3 differ from claims 2 and 4, as earlier noted, plaintiff does not rely on such difference as material to its arguments for infringement or validity. Accordingly, the claims are hereafter treated together.

forming when forced into place. The rivets froze to the pan much like ice cube trays freeze to the freezer compartment of an ordinary home refrigerator. Sciaronni built a crude plywood tub on which the honeycomb was placed, filled with water, frozen solid, and machined similarly to the Boeing process here in issue. He showed the finished honeycomb piece to several McDonnell personnel, including a patent engineer, and explained the machining process used. The piece so-machined ultimately was used with an experimental helicopter in flight tests in late 1946.

In 1950, during performance of another contract to build helicopters, Sciaronni was again concerned with shaping honeycomb to airfoil contour. This time, Speck, a shop foreman, was directed by Walter Williams, superintendent of the machine shop, to shape the piece. Although Sciaronni had knowledge of Williams' request to Speck, Sciaronni did not tell Speck at that time how he (Sciaronni) had in 1946 used the ice-chuck method to machine similar honeycomb. Sciaronni testified that he did not so-inform Speck because he wanted to see what technique Speck would come up with so that "[m]aybe I could learn something."

Speck proceeded in much the same manner as had Sciaronni four years earlier. He first used cerrobend to fill honeycomb; and because of the problems it created in later bonding the honeycomb to the rotor blade, he turned to the ice-chuck method, substantially as performed by Sciaronni in 1946, after recalling an earlier experience of freezing rubber before cutting it. Sciaronni then told Speck that he (Sciaronni) had used the same ice-chuck process four years earlier; and, together, they machined several pieces of honeycomb for the new helicopter blade. Sciaronni and Speck in 1950 told Williams, the machine shop superintendent, and Walter Burke, president of McDonnell, about the process

and showed them honeycomb pieces shaped thereby.

A patent application was never filed on the Sciaronni-Speck method, although notebook records were kept by Sciaronni in 1946. The records, however, were personal and were not submitted to patent counsel or supervisory personnel at McDonnell for further evaluation. Although Sciaronni testified that the method was used from time to time at McDonnell up to 1952 to make small samples of honeycomb, there is no evidence that the method was used by anyone at McDonnell after 1950 to make finished honeycomb filler; that the method was described in any document or report; or that knowledge of the method was ever disseminated outside McDonnell, though it was apparently not considered proprietary information.

■■ Defendant does not contend that the activites of Sciaronni in 1946, and Speck and Sciaronni in 1950, constitute prior knowledge or use by others of the ice-chuck method within the meaning of 35 U.S.C. § 102(a); but rather it contends that such activities constitute prior invention in this country by others who had not "abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g). The distinction is important since, unlike a defense under section 102 (a) where prior knowledge and use must be "public" at the time the patented invention is made (Gayler v. Wilder, 51 U.S. (10 How.) 477, 13 L.Ed. 504 (1850); Soundscriber Corp. v. United States, 360 F.2d 954, 175 Ct.Cl. 644 (1966)), prior invention under section 102(g) requires only that the invention be complete, *i.e.,* conceived and reduced to practice, and not abandoned, suppressed or concealed. Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 48 S.Ct. 380, 72 L. Ed. 610 (1928); Coffin v. Ogden, 85 U.S. (18 Wall.) 120, 21 L.Ed. 821 (1873); Armour & Co. v. Wilson & Co., 168 F. Supp. 353, (N.D.Ill.1958).[7] Section 102

7. For an analysis of sections 102(a) and 102(g), see Woodcock, What Is Prior Art, in The Law of Chemical, Metal-lurgical and Pharmaceutical Patents (H. Foreman ed. 1967), pp. 87–104; J. Oisher & C. Steinhauser, The Role of the Prior

(g) most commonly applies to priority disputes in U.S. Patent Office interference proceedings. However, it may also be an appropriate defense to patent validity in infringement litigation where a patent application was never filed by the prior inventor. Engelhardt v. Judd, 369 F.2d 408, 411, (Cust. & Pat.App.1966).

█ The evidence is clear that Sciaronni in 1946 and Speck in 1950 conceived and reduced to practice the ice-chuck process substantially like the Boeing process here in issue.[8] The question remains, however, whether they abandoned, suppressed or concealed their process within the meaning of section 102(g). The courts have consistently held that an invention, though completed, is deemed abandoned, suppressed, or concealed if, within a reasonable time after completion, no steps are taken to make the invention publicly known. Kendall v. Winsor, 62 U.S. (21 How.) 322, 16 L.Ed. 165 (1858); Mason v. Hepburn, 13 App. D.C. 86 (1898); Gillman v. Stern, 114 F.2d 28 (2d Cir. 1940), cert. denied, 311 U.S. 718, 61 S.Ct. 441, 85 L.Ed. 468 (1941). Thus, failure to file a patent application (*Mason, supra*); to describe the invention in a publicly disseminated document (*Corona, supra*); or to use the invention publicly (Allinson Mfg. Co. v. Ideal Filter Co., 21 F.2d 22 (8th Cir. 1927)), have been held to constitute abandonment, suppression or concealment. See also Emerson v. National Cylinder Gas Co., 146 F.Supp. 581, (D. Mass.1956); Carter Products v. Colgate-Palmolive Co., 130 F.Supp. 557 (D.Md. 1955); Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530 (2d Cir. 1955), cert. denied, 350 U.S. 911, 76 S.Ct. 193, 100 L.Ed. 799 (1955). II Walker, Patents § 154 at 723–24 (Deller's 2d ed. 1964). Neither Sciaronni, Speck, nor anyone else at McDonnell took steps, after 1946 or 1950, to make public the results of their ice-chuck process. Their work lay dormant, did not enrich the art, and thus "remained secret, effectively concealed and suppressed until exhumed by * * [defendant] for the defense of this case."

Inventor Under Section 102(g), 45 J. Pat.Off.Soc'y 595 (1963). See also Note, Prior Art in the Patent Law, 73 Harv. L.Rev. 369, 372 (1959).

8. Plaintiff contends that the Sciaronni-Speck work "amounted to no more than an abandoned experiment and a dismissal commercial failure." However, reduction to practice of a process requires only that it be "successfully performed." *Corona, supra*. The Sciaronni-Speck work meets such criterion. Further, commercial use is not necessary to establish actual reduction to practice. Jones v. Tucker Aluminum Products of Miami, Inc., 233 F.Supp. 403, 408 (S.D.Fla. 1964).

Plaintiff also contends that the Sciaronni-Speck process was materially different from the Boeing process. In particular, plaintiff says Sciaronni and Speck did not continuously cool the ice bond between the honeycomb block and the work platform to which it was frozen to maintain its temperature below 0° C. during machining. This is crucial, says plaintiff, since otherwise the bonds tend to melt and become "progressively weaker." Plaintiff even suggests that it is for this reason Speck and Sciaronni, and others at McDonnell, discarded their process after 1950.

The record does not support plaintiff. While it is true neither Speck nor Sciaronni continuously cooled their honeycomb-ice blocks during machining, they were aware of the problem of premature thawing of the bonds. Speck said, in his stipulated testimony, that he and Sciaronni "hurried across the shop with the frozen honeycomb to get the frozen block to the router before the ice melted." Yet, despite no cooling during machining, Speck said, "the ice block containing honeycomb remained adhered to the flat plate * * *" and "the adhesive qualities of the ice kept the honeycomb rigidly bonded to the plate." Speck further noted, "after completing the shaping operation on the router, Mr. Sciaronni and myself decided to let the frozen block remain on the plate to see how long it would take the ice to melt. From this observation, we realized that it was not necessary to run as we did from the refrigerator to the routing machine. The ice took a comparatively long time to melt." Had premature thawing of ice bonds been a problem faced by Sciaronni or Speck in 1946 or 1950, it would seem the obvious solution was to use additional refrigeration.

**404**

Carter, supra, 130 F.Supp. at 569. Defendant therefore has failed to make out a defense under 35 U.S.C. § 102(g).

■ Defendant challenges the validity of claims 1–4 under 35 U.S.C. § 103, which requires that the invention be unobvious to one of ordinary skill in the art at the time it is made. Resolution of this issue requires factual analysis of (1) the scope and content of prior art, (2) the differences between the prior art and the claims in issue, and (3) the level of ordinary skill in the pertinent art. Graham v. John Deere, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Martin-Marietta Corp. v. United States, 373 F.2d 972, 179 Ct.Cl. 70, (1967). To show the prior art, defendant relies on several patents and publications. Defendant further relies on the Sciaronni-Speck activity at McDonnell in 1946 and 1950 which, though not part of the statutory prior art under 35 U.S.C. § 102, may be evidence under section 103 of the level of ordinary skill in the art at the time the invention was made. Servo Corp. of America v. General Electric Co., 337 F.2d 716, (4th Cir. 1964), cert. denied, 383 U.S. 934, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966); Canadian Ingersoll-Rand Co v. Peterson Products of San Mateo, 223 F.Supp. 803 (N.D.Cal.1963), aff'd in part 350 F.2d 18, (9th Cir. 1965).

The prior art, described fully in findings 10 to 14, shows that plaintiff was not first to come up with the idea, broadly speaking, of freezing a workpiece to a work station with ice. Before plaintiff's invention, biological specimens to be sliced for microscopic examination were frozen by ice to a microtome work platform; fish to be deskinned were frozen to conveyor belts preparatory to cutting off the fish carcass from the skin; and indeed, as early as 1932, a textbook on adhesives taught that ice is a good bonding material. Also in the prior art

is a patent dealing with the problem of removing ice cube trays frozen to freezer compartment shelves by ice bonds. Thus, long before the patentee's invention, ice as a bonding agent was well known in the art.

None of this prior art was cited by the patent examiner during prosecution of the patent application.[9] The Patent Office relied principally on a patent to Turner et al. (finding 12) which teaches a method for temporarily holding down lens blanks to a work station for grinding or other treating by cementing the blanks to the station with wax or blocking pitch, both thermoplastic materials of higher melting point than ice. The wax or pitch is heated to its softening point, then cooled and set with the lens blanks in position. Plaintiff's expert at trial admitted that lens blanks are "difficultly manageable workpieces" within the meaning of plaintiff's patent claims and that grinding or other treating of lens blanks is "precision treatment." The principal difference therefore between the prior art and the plaintiff's claimed process is that plaintiff uses ice rather than wax or pitch as a temporary cementing agent, a difference defendant says is obvious, even though ice, unlike wax or pitch, must be refrigerated during the process to keep it frozen.

■ Patents are presumed valid. 35 U.S.C. § 282. The presumption, however, may be overcome when pertinent prior art was not before the Patent Office. Preformed Line Products Co. v. Fanner Mfg. Co., 328 F.2d 265, 271 (6th Cir. 1964), cert. denied, 379 U.S. 846, 85 S.Ct. 56, 13 L.Ed.2d 51. In such event, the court must examine the question of validity in view of newly cited art, keeping in mind the admonition against hindsight reasoning.

■ Plaintiff would dismiss the prior art relating to biological specimens

9. Plaintiff would explain this as the examiner's wise refraining from "overloading the record" with irrelevant material. More likely, the examiner simply was not aware of such prior art. It is impossible to tell whether the examiner's prior art search included those classes and subclasses in which the newly cited art is kept since, contrary to usual practice, the examiner's search record is not included with the certified Patent Office documents in evidence.

and fish carcasses as nonanalogous and remote, arguing that such specimens and carcasses are not "workpieces" within the context of the patented invention, nor are slicing and cutting properly considered "precision treatment." Yet at the same time, plaintiff would construe the patented invention to include honeycomb, despite the very significant differences between honeycomb and gem stones and their treatment, already noted. Plaintiff cannot have it both ways. Claims cannot be broadly construed to make out infringement and narrowly construed to avoid invalidity. Wire Tie Machinery Co. v. Pacific Box Corp., 107 F.2d 54 (9th Cir. 1939); Emery Industries, Inc. v. Schumann, 111 F.2d 209 (7th Cir. 1940). Therefore, the newly cited prior art is pertinent.

 The problem of hindsight is greatly minimized in this case where there is evidence of the level of ordinary skill in the art and how those skilled in the art approached and solved problems of holding down honeycomb which plaintiff would include among "difficultly manageable workpieces" within the meaning of the claims. Sciaronni and Speck, independently and several years before the invention in suit was made, conceived the idea of ice bonding honeycomb as part of their normal work of machine shop practice. They hit upon the idea immediately when seeking a bonding material which would not contaminate honeycomb edges.[10] The fact

of near-simultaneous invention, though not determinative of statutory obviousness, is strong evidence of what constitutes the level of ordinary skill in the art. Reeves Bros. v. U. S. Laminating Corp., 282 F.Supp. 118, 140 (E.D.N.Y.1968), and cases cited therein. Considering this evidence in light of all the prior art, including the patents and publications which show that, at the time the invention in suit was made, ice was a well-known bonding agent, the claims in suit cannot be so broadly construed as to cover the processes of Boeing and Rohr. To do so would render the claims invalid as defining a process obvious to those skilled in the art within the meaning of 35 U.S.C. § 103. Whether the claims are valid when construed to cover the process for use specifically with gem stones or like workpieces, it is not necessary to decide.

 In sum, claims 1 to 4 are invalid under section 103 if construed broadly enough to read on the accused processes; and if narrowly construed to avoid invalidity, there is no infringement.[11] See Farrell Marine Devices, Inc. v. United States, 377 F.2d 560, 179 Ct. Cl. 790 (1967).

 Defendant also contends that claims 1 and 3 are invalid as "anticipated" by the Richards patent, U.S. No. 2,292,973, under 35 U.S.C. § 102(a) or (b). To anticipate, a prior-art reference must disclose all the elements of the

10. In passing, it is noted that the patentee in suit also was concerned with finding a noncontaminating bonding material. Unlike wax and pitch, water could be easily removed from workpieces and the work station without solvents or the like. The patent specification says, "Moreover, the used dopsticks may be reconditioned for re-use with only a single cleaning operation. Usually an air blast cleaning suffices."

11. As to infringement, defendant in its brief points out other differences between the accused processes and the claimed process, which differences for the most part relate to dissimilarities between gem stones and honeycomb as workpieces. E. g., defendant argues that, unlike plaintiff's process, Boeing and Rohr do

not use a "film" of water (claims 3 and 4) to make the ice bond between honeycomb and the work platform. Rather, defendant says, they use a "thickness" of ice from ¼ inch (Rohr) to several inches (Boeing). Defendant contends a "film" of water would not make an ice bond sufficiently strong to anchor honeycomb because thin-edged honeycomb, unlike gem stones, has a very small surface area in relation to its overall size in contact with the work platform. Thus, an ice bond therebetween would not have "adequate holding power" to prevent movement of the honeycomb during machining.

It is unnecessary to resolve this and other of defendant's defenses in view of the above disposition of the validity-infringement issue.

claimed invention, or their equivalents, functioning in substantially the same way to produce substantially the same result. Straussler v. United States, 339 F.2d 670, 168 Ct.Cl. 852 (1964). Richards relates to microtomes which are instruments for slicing thin sections off pieces of organic matter, such as biological specimens, for microscopic examination. The specimen, normally soft and pliant, is frozen solid to a workplate by an ice bond, then sliced with a knife which moves back and forth across the top of the specimen. Freezing the specimen not only secures it to the workplate but also makes it rigid for easy slicing. Richards teaches nothing about gem stones nor the problems relating to their manufacture. As claims 1 and 3 must be construed to avoid invalidity under section 103, discussed above, Richards does not anticipate since biological specimens are not equivalent to gem stones as "difficultly manageable workpieces," nor is slicing equivalent to polishing, grinding or buffing as "precision treatment." Richards therefore does not anticipate claims 1 and 3 as those claims are herein construed.

Davis and Laramore, JJ., dissented in part; Collins, J., dissented.