Wendell Starnes FLETCHER

v.

The UNITED STATES.

No. 233-68.

United States Court of Claims.

May 11, 1973.

---

\* Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5 Cir., 1970, 431 F.2d 409.

John D. Nies, Arlington, Va., for plaintiff. Philip E. Kurz, Arlington, Va., atty. of record. Strauch, Nolan, Neale, Nies & Kurz, Arlington, Va., of counsel.

A. David Spevack, Washington, D. C., with whom was Asst. Atty. Gen., Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's exceptions to a recommended decision filed August 30, 1972, by former Trial Commissioner James F. Davis pursuant to Rule 134(h). The court has considered the case on the briefs and oral argument of counsel. Since the court agrees with the decision as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, it is concluded that claim 1 of U. S. Patent 2,596,139 is not infringed and the petition is dismissed.

## OPINION OF COMMISSIONER

DAVIS, Commissioner:

This is a suit for patent infringement pursuant to 28 U.S.C. § 1498. Plaintiff contends that claim 1 of his patent, U. S. 2,596,139 (issued in 1952), entitled "Streamlined Auxiliary Fuel Tank," is infringed by five different auxiliary fuel tanks procured and used by the Government during the pertinent accounting period. Defendant denies infringement and also says that the patent claim is invalid, among other reasons as defining an invention which is "obvious" within the meaning of 35 U.S.C. § 103. The case raises no novel issues of law and its resolution involves, typically, a construction of the scope and meaning of the patent claim and the readability of the claim, so construed, on the accused devices. Autogiro Co. of America v. United States, 181 Ct.Cl. 55, 384 F.2d 391 (1967), rehearing denied, 184 Ct.Cl. 801 (1968). For reasons set out in the accompanying findings of fact and ultimate findings and conclusions, I hold (a) that the patent claim must be narrowly construed in view of very close prior art, and (b) when so construed, the claim is not infringed. If construed so as to be infringed, the claim would be invalid. International Glass Co. v. United States, 187 Ct.Cl. 376, 408 F.2d 395 (1969). Accordingly, the petition must be dismissed.

## FINDINGS OF FACT

1. This is a patent suit under 28 U.S.C. § 1498. Plaintiff seeks reasonable and entire compensation for alleged unauthorized use by defendant, the United States, of the invention defined by claim 1 of U.S. Patent 2,596,139 (the '139 patent or patent in suit), entitled "Streamlined Auxiliary Fuel Tank," is-

sued May 13, 1952, on an application filed April 1, 1949, by plaintiff, Wendell S. Fletcher. Plaintiff's petition was filed in this court on August 14, 1968. Plaintiff is the sole owner of the patent in suit.

2. The issues before the court are patent validity and patent infringement. Accounting, if any, is deferred to later proceedings.

3. The patent in suit relates to auxiliary fuel tanks for mounting on the wing tips of airplanes. The tanks are streamlined so as to be as "free from parasitic drag as possible." The tanks comprise three sections: a "conoidal nose section which is semi-elliptical in longitudinal section, a tail section which is conical, and a cylindrical intermediate section." The sections may be "formed integrally" or "made as separate components which may be secured in end-to-end relation" so as to be separable.

4. The patent specification sets forth data by which tanks of varying capacity can be constructed. The specification says, " * * * regardless of the capacity of the tank, there exist definite and fixed relations between the dimensions of the components. I have found that by using the total length of the tank as a basis, the proportions of the components can be readily calculated as percentages of their length to obtain a tank having the desired contour and possessing the optimum Mach coefficient." The specification then sets out the mathematical relationship of the component parts which is best summarized by reference to Fig. 1 of the patent, reproduced herein. Reference numeral 6 is the conoidal nose section; 7 is the cylindrical intermediate section; and 8 is the conical tail section. The dimensions of the various sections vary in accordance with the parameters set out in Fig. 1.

*Fig. 1.*

5. The patent specification sets out Tables A and B (reproduced herein) which teach how to construct the contours of the tank illustrated in Fig. 1, having a given volume and a maximum diameter of 25.41 inches. Table A shows the length of center sections required for tanks of varying capacity (122 gals. to 300 gals.), the center section being 25.41 inches in diameter. The center section length varies from 3 inches (for a 122-gal. tank) to 86 inches (for a 300-gal. tank). Table B shows the coordinates by which the contour of the nose and tail sections can be determined for a 25.41-inch-diameter tank. The specification notes that in calculating the contours, the length of the center section is "neglected," so that the nose and tail section contours of any tank having a center section diameter of 25.41 inches are the same. Thus, the patent teaches

how to construct a family of auxiliary tanks, varying in total capacity and length but having the same maximum diameter (25.41 inches).

TABLE A

[For cylinder 25.41″ diameter]

| Tank capacity with 3 percent air space allowance (gallons) | Length of cylindrical portion 7 (inches) |
|---|---|
| 122 | [1] 3 |
| 150 | 16 |
| 165 | 23 |
| 185 | 33 |
| 200 | 40 |
| 250 | 63 |
| 300 | 86 |

[1]. Minimum.

TABLE B—Ordinates

| Station, percent [1] | Diameter, percent [1] | |
|---|---|---|
| 0. | 0. | |
| 1.92 | 7.12 | |
| 3.80 | 9.96 | |
| 5.75 | 12.04 | |
| 7.70 | 13.74 | |
| 9.61 | 15.20 | |
| 13.46 | 17.54 | Nose section 6. |
| 17.30 | 19.36 | |
| 21.15 | 20.82 | |
| 25.00 | 21.98 | |
| 28.84 | 22.88 | |
| 32.69 | 23.56 | |
| 36.53 | 24.04 | |
| 40.38 | 24.32 | |
| 44.23 | 24.42 | Intermediate section 7. |
| 47.11 | 24.42 | |
| 50.00 | 24.28 | |
| 52.88 | 23.92 | |
| 55.76 | 23.28 | |
| 58.65 | 22.42 | Tail section 8. |
| 61.53 | 21.24 | |
| 64.42 | 19.80 | |
| 100.00 | 0. | |

[1]. Indicates percent of total length of tank.

6. It is not clear from the patent specification how one would, in accordance with the teachings of the patent, determine the precise contours of tanks having a center section diameter different from 25.41 inches. Presumably, tanks having a center section diameter different from 25.41 inches would have nose and tail sections of contour similar to that shown in Fig. 1, but varied in diameter proportionately to the change in center section diameter. Thus, a tank of, e. g., 24 inches in center section diameter would have nose and tail sections of maximum diameter of 24 inches and intermediate diameters correspondingly smaller in accordance with the ordinates set out in Table B.

7. The patent specification does not define the term "semi-elliptical" with respect to the contour of the nose section. That term is used in the patent claims, so that its meaning is important to understanding the scope of the claims. There was conflicting and unclear testimony at trial from the inventor and others skilled in the art as to whether the term means "half" of a true mathematical ellipse or simply "generally elliptical" in shape. Nor is it clear whether the contour shown in Fig. 1 is a segment of a true mathematical ellipse or is just "generally" elliptical in the sense that it approximates a true ellipse. Accordingly, for purposes of interpreting the patent specification and claims, and in the absence of a precise definition, the term "semi-elliptical" must be construed to embrace (a) the contour shown in Fig. 1, (b) contours derivable from Table B, and (c) contours substantially identical thereto.

8. The patent application was filed on April 1, 1949, and it incorporated by reference a copending application earlier filed by plaintiff which taught in detail how to join together the separate tank sections. By amendment dated February 12, 1951, and after all the claims had been finally rejected by the Patent Office, the application was amended to include a new drawing (Fig. 4) and additional

textual matter. The new drawing was taken from plaintiff's earlier-filed co-pending application and disclosed details of construction of the separable tank which was similar in contour to the tank disclosed in the patent in suit. The textual matter describes the means by which separate sections of the tank are connected and adds the following:

* * * by unscrewing the tie rod [joining the three sections] the three sections * * * may be taken apart, and another center section of different length may be substituted for the [original] center section * * *.

The above-quoted textual matter finds support in the earlier-filed application which notes that intermediate sections can be added or subtracted to change the capacity of the tank. Accordingly, such textual matter is not "new matter" within the meaning of 35 U.S.C. § 132, since it simply makes explicit in the patent in suit what was explicit in the cross-referenced copending application.

9. (a) The patent in suit has four claims, set out below. Only claim 1 is here in issue:

1. An auxiliary tank adapted for mounting adjacent a wing surface of a high-speed airplane, comprising: a conoidal nose section of semi-elliptical longitudinal sectional contour with the major axis thereof extending longitudinally of said tank; a cylindrical intermediate section; and a tail section having a right circular conical end portion, all said sections being circular in transverse section and of the same maximum diameter and being releasably joined together at a circumferential joint defining a continuous and smooth longitudinal transition between the surfaces of said sections whereby other cylindrical intermediate sections may be added or substituted to change the capacity of said tank or to shift the center of gravity thereof.

2. An auxiliary tank as defined in claim 1 wherein said tail section includes a longitudinally circularly arcuate curved surface portion of substantial length of nearly cylindrical shape adjacent said intermediate cylindrical section and tangent to said conical end portion whereby to merge smoothly and tangentially therewith.

3. An auxiliary tank as defined in claim 1 wherein said nose and tail sections are so proportioned that the ratio of their longitudinal dimensions to their maximum diameter is of the order of magnitude of two.

4. An auxiliary tank as defined in claim 1 wherein said conoidal nose section has a maximum diameter approximately 55% of its length, said cylindrical intermediate section has a length not less than 2.88% of the total length of the tank, and wherein said tail section has a maximum diameter of approximately 46% of its length.

(b) As originally filed, the patent application asserted claims which, in essence, defined the invention as an auxiliary fuel tank having a semi-elliptical nose, a cylindrical midsection and a conical tail. Some of the claims were more specific in defining the mathematical relationship among the tank's component parts. All claims were rejected over the prior art, and ultimately, plaintiff amended the claims to make reference to the concept that the tank was separable and had a cylindrical center section for the purpose of adding or substituting other center sections "to change the capacity of said tanks or to shift the center of gravity thereof." The claims were ultimately allowed after further prosecution during which plaintiff stressed the fact that his tank has definite, definable parameters of contour and is designed for varying the fuel capacity by inserting new center sections.

10. Plaintiff has been active in the field of aviation since 1918 as a pilot, a flight instructor, mechanic, teacher, de-

signer, and manufacturer until his retirement in 1964. In the late 1930s, plaintiff formed his own company, Fletcher Aviation Company.

11. In 1948, plaintiff went to Wright Field, Dayton, Ohio, in connection with his efforts to become a supplier to the Air Force of airplane wing tanks. Plaintiff was advised that the wing tank then being used on F–80 jet aircraft was unsatisfactory because it caused various problems (e. g., aileron buzz, buffeting and flutter) during high-speed jet flight. The tank was known as the "teardrop" tank because its configuration approximated the shape of a teardrop. The "teardrop" tank had a continuously-curved elliptical nose and a conical tail, with a right conical end portion, as shown by a drawing in evidence of a standard Air Force contour in use at the time.

12. (a) After a period of consultation and discussion with engineering personnel at Wright Field extending over several months of 1948 (about which there is conflicting testimony in the record regarding what technical information was exchanged and who came up with various suggestions for tank redesign), plaintiff submitted to Wright Field for evaluation a redesigned "teardrop" tank. The redesigned tank included a center section of cylindrical shape and was made in three separable parts. But for the added center section, the tank contour was substantially the same as the Air Force standard "teardrop" tank. Plaintiff testified that, prior to redesigning the "teardrop" tank, he did some rudimentary experiments with tank models in his bathtub and determined that the addition of a cylindrical center section provided smoother fluid flow over the tank's contour and improved its aerodynamic properties.

(b) During the time plaintiff was visiting Wright Field in 1948 and prior to redesigning the "teardrop" tank, there existed in Wright Field's files photographs of another tank called the Duramold tank, which the Government had procured near the end of World War II. The Duramold tank was plastic, and was made in three sections; an elliptical nose section (substantially identical to the "teardrop" nose section), a barrel-shaped center section, and a contoured tail section ending in a right circular cone (substantially identical to the "teardrop" end section). Procurement of Duramold tanks ended with World War II. The contour of the Duramold tank was substantially identical to plaintiff's redesigned tank except that it had a barrel-shaped center section rather than a cylindrical center section. There is conflicting evidence whether plaintiff saw the Duramold tank photographs. Plaintiff denies having seen them, but one of the Government's witnesses testified that they were shown to plaintiff. In any event, the evidence establishes that the photographs were generally available to contractors interested in supplying fuel tanks to the Air Force, along with other drawings and photographs showing previously-procured tanks.

13. In late 1948, the Air Force successfully flight-tested plaintiff's redesigned tank. Shortly thereafter, the Air Force adopted the new tank design as a replacement for the "teardrop" design. During the Korean war, the Air Force used tanks supplied by the plaintiff having contours above noted and being separable into three pieces. At times, the Air Force in combat zones added center sections to the tanks to change their fuel-carrying capacity.

14. Defendant introduced into evidence a host of prior art references showing various configurations and embodiments of auxiliary fuel tanks and other streamlined aerodynamic bodies. Two particularly pertinent references are: U.S. Patent 2,514,888 to McFarland, issued in 1950 on an application filed in 1947; and U.S. Patent 2,471,296 to Allen et al., issued in 1949 on an application filed in 1944. The McFarland patent, entitled "Aircraft Wing Tip Fuel Tank Installation," teaches, among other things, a wing tip tank for use on a jet aircraft. Other evidence of record shows that the McFarland tank was made for and used on a Navy jet aircraft (XF6U–

1) in the mid-1940s. The tank has three integral sections: a generally elliptical nose section, a cylindrical mid-section and a generally conical tail section. Other evidence shows that the tail section of the McFarland tank had a right conical end portion, substantially the same as the standard Air Force "teardrop" tank.

Allen et al., entitled "Jettison Fuel Tank," teaches a generally "teardrop" -shaped tank which is separable into three sections: a nose section, a mid-section and a tail section. The sections are made separable so as to be nestable for ease of shipment and handling prior to assembly. The mid-section is split longitudinally and, when assembled, the split is closed up by a bolted flange arrangement.

15. In the 1940s, the Air Force required that auxiliary fuel tanks be made in separable sections so as to be nestable for ease of handling and shipping. Army Air Forces Specification No. 28495–C, dated 24 September 1946, required as follows:

> *Construction.*—External jettisonable fuel tanks shall be of the nested or collapsed type. Nested tanks shall be designed for shipment in the disassembled condition and when packaged in this condition shall have a space-saving factor of 2.5 to one compared to the assembled volume. Collapsible tanks shall be designed for shipment in the collapsed condition and when packaged in this condition shall have a space-saving factor of five to one compared to the assembled volume.

Later specifications permitted external fuel tanks, which were for "continuous service," to be preassembled for installation on an aircraft.

16. In sum, the prior art of record shows that, at the time the invention in suit was made, the following were old and well-known:

(a) Auxiliary fuel tanks for attaching to airplane wings having an elliptical nose section and a conical tail section, the tail section being in part a right circular cone (findings 11, 12(b));

(b) Auxiliary fuel tanks for attaching to an airplane wing tip having an elliptical nose section, a cylindrical mid-section and a conical tail section (finding 14);

(c) Auxiliary fuel tanks for attaching to airplane wings made in two or three separable sections, the front and back sections being, respectively, of elliptical contour and (in part) right circular conical contour (findings 12(b), 14, 15).

In view of the prior art, claim 1 is entitled, at best, to a narrow construction, and covers only a tank having contours substantially identical to the tank taught by the patent specification and designed to have separable sections with center sections of variable length for addition or substitution to alter the fuel-carrying capacity and/or center of gravity of the tank.

17. Plaintiff contends that claim 1 is infringed by five auxiliary fuel tanks procured and used by the Government during the pertinent accounting period. The tanks are as follows:

(a) Type II 450 Gallon tank;

(b) Tank Assembly—1360 Gallon tank;

(c) Tank Assembly—200 Gallon F–104 tank;

(d) Tank Installation—275/335 Gallon tank;

(e) Type I 300 Gallon tank.

18. Tanks (a), (b) and (e) above are made in three sections: a generally elliptical nose section, a cylindrical mid-section and a tail section having at its end a right conical portion. The sections are joined together by interlocking corrugations along the circumference of their ends. Tanks (a) and (e) have cylindrical sections which are split longitudinally and are bolted shut when assembled with the nose and tail sections.

There is no evidence that the nose sections of tanks (a), (b) and (e) follow

a contour identical (or substantially identical) with the contour disclosed in the patent in suit or are "semi-elliptical" within the meaning of claim 1 (finding 7); nor does the evidence establish that any of the tanks was designed as one of a family of tanks to have interchangeable center sections of different lengths. There is no evidence that the Government procured additional center sections for substitution in the respective tanks to vary their capacity or center of gravity, nor that the tanks were manufactured to accomodate at any time a quantity of fuel different than that originally designed for. So far as the record shows, the tanks have a contour materially identical to the prior art XF6U–1 tanks and were made in separate pieces for ease of handling and nesting prior to installation, as in the prior art, rather than for addition or substitution of different center sections.

19. Tank (c) above is made in three sections: a nose section, a cylindrical mid-section and a tail section having at its end a right conical portion. The sections are joined together as noted in finding 18. The center section is split longitudinally and is bolted shut when assembled with the nose and tail sections. The nose section has a contour which is generally parabolic, rather than elliptical or "semi-elliptical" within the meaning of claim 1 (finding 7). The evidence does not establish that the tank was made to have interchangeable center sections of different lengths so as to be one of a family of tanks having variable capacity; that the Government procured or intends to procure additional center sections for substitution in the tank to vary its capacity or center of gravity; nor that the tank was made to accommodate at any time a quantity of fuel different from that originally designed for. So far as the record shows, the tank was made in separate pieces for ease of handling and nesting prior to installation, as in the prior art, rather than for addition or substitution of different center sections.

20. Tank (d) above is made in three basic sections: a nose section which has a forward part and an aft part; a cylindrical center section; and a tail section having three parts, the end part being a right conical section. The parts are joined together by V-notches and a bolting arrangement. The longitudinal axis of the tail section angles upward from the longitudinal axis of the nose and cylindrical sections, resulting in a tank which may be characterized as "banana-shaped." The tank bears little resemblance to the tank of the patent in suit because (i) the nose section is parabolic rather than elliptical or "semi-elliptical" within the meaning of claim 1 (finding 7), and (ii) the tank has a broken longitudinal axis and is not symmetrical about any one axis. The evidence does not establish that the tank was made to have interchangeable center sections of different lengths so as to be one of a family of tanks having variable capacity; that the Government procured additional center sections for substitution in the tank to vary its capacity or center of gravity; nor that the tank was made to accommodate at any time a quantity of fuel different from that originally designed for. So far as the record shows, the tank was made in separate pieces for ease of handling and nesting prior to installation, as in the prior art, rather than for addition or substitution of different center sections.

## ULTIMATE FINDINGS AND CONCLUSIONS

21. To be valid in view of the prior art, claim 1 must be narrowly construed to embrace auxiliary fuel tanks (a) having contours substantially identical to the contour taught by the patent specification and (b) designed to have, and in fact having, interchangeable center sections for varying the fuel capacity and/or center of gravity of the tanks. (Finding 16.) If more broadly construed to embrace any tank made in three separable sections, the sections being generally elliptical (nose), cylindrical (center) and conical (tail), claim 1 would be invalid as defining subject matter which would have been "obvious" within the meaning of

35 U.S.C. § 103. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed. 2d 545 (1966).

22. The Type II 450 Gallon tank, Tank Assembly-1360 Gallon tank and Type I 300 Gallon tank do not infringe claim 1, as narrowly construed to be valid. There is no evidence that the accused tanks have contours substantially identical to the patented tank; that the contours of the accused tanks were derived from the teachings of the patent specification; or that the accused tanks were designed to have, and in fact have, interchangeable center sections of varying length for altering the tanks' fuel capacity and/or center of gravity. The design and contours of the accused tanks follow the teachings of the prior art (or are derivable within ordinary skill from the teachings of the prior art), rather than the patent in suit, and thus do not infringe any valid claim. (Finding 18.) Scott Paper Co. v. Marcalus Mfg. Co., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47 (1945).

23. The Tank Assembly-200 Gallon F–104 tank and the Tank Assembly-275/335 Gallon tank do not infringe claim 1, as narrowly construed to be valid. The nose sections of the accused tanks are parabolic, rather than elliptical, in contour and do not respond to the claim language "semi-elliptical in longitudinal section." The nose contour of the accused tanks was not derived from the teachings of the patent specification. Furthermore, there is no evidence that the accused tanks were designed to have, and in fact have, interchangeable center sections of varying length for altering the tanks' fuel capacity and/or center of gravity. (Findings 19, 20.)

## CONCLUSION OF LAW

Upon the foregoing findings of fact and opinion which are made a part of the judgment herein, the court concludes as a matter of law that claim 1 of U.S. Patent 2,596,139 is not infringed and the petition is dismissed.