**FULL MOLD PROCESS, INC., Plaintiff,**

v.

**CENTRAL IRON FOUNDRY CO., Defendant.**

Civ. A. No. 76–71084.

United States District Court, E. D. Michigan, S. D.

May 13, 1980.

Dale R. Small, Whittemore, Hulbert & Belknap, Detroit, Mich., for plaintiff.

Neal A. Waldrop, Troy, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

### Introduction

Defendant filed this motion for summary judgment on June 22, 1979, in a patent infringement action filed pursuant to 35 U.S.C. § 281–293, on May 27, 1976. This court's jurisdiction is proper, under 28 U.S.C. §§ 1331, 1332, 1338, and § 1400. Plaintiff, by assignment from certain West German inventors, is the owner of U. S. Patent No. 3,314,116, issued April 18, 1967 (hereinafter referred to as No. '116), and U. S. Patent No. 3,498,360, issued March 3, 1970 (hereinafter referred to as No. '360). The patents relate to certain aspects of a

---

foundry process for making metal castings by the use of gasifiable plastic patterns.

In response to plaintiff's claim for infringement of certain claims of its patents, defendant asserts pursuant to Rule 56, F.R. C.P. that there is no genuine issue of any material fact, and that it is entitled to a judgment of the invalidity of plaintiff's patents, as a matter of law. Defendant's motion is based upon the briefs and pleadings of record, admissions, answers to interrogatories, the File Wrappers of the patents in suit, depositions, and undisputed exhibits. The matter was thoroughly argued to the court on March 24, 1980, and the court hereby orders that Summary Judgment be entered for defendant.

## I.  The Patents in Suit

It is undisputed that the earliest effective date of invention of the allegedly infringed claims of either of plaintiff's patents is April 2, 1962 (Plaintiff's Answers to Defendant's Interrogatories, Nos. 2 and 6, filed March 4, 1977). Similarly, there is no dispute that the earliest date of application for United States patent on these claims, as to both patents, is April 2, 1963. (Plaintiff's Answers to Defendant's Interrogatories, Nos. 3 and 7, filed on March 4, 1977).

The plaintiff's business is essentially one of licensing the use of patents to others. From 1963 until its expiration in 1975, the "Shroyer" process patent was licensed by the plaintiff (U. S. Patent No. 2,830,343). This patented process was the technological predecessor to the patents in suit.

Defendant operates a foundry in Detroit, Michigan, which makes use of the process covered by the original "Shroyer" patent, as improved-upon by the '116 and '360 patents.

On or about February 5, 1971, defendant and plaintiff entered into a license agreement by which defendant agreed to pay royalties to plaintiff for the use of the '116 and '360 patents. Such license was cancelled by plaintiff in 1976 for non-payment of royalties, and defendant's continued use of the patents has precipitated the instant litigation.

The "Shroyer" patented process involved the use of a plastic pattern or mold, fashioned into the shape of the product to be made. The product so manufactured might be industrial machinery components, or it could be artistic or decorative metalwork. The plastic used is combustible, such as polystyrene, and is buried in sand or other "mold material" inside of a protective box. Molten metal is then poured into the form through a "sprue" which leads from the mold to above the surface of the sand. At that point, the plastic burns away, and the metal object is left to cool and solidify. During this process, gases are created by the combustion of the plastic, which must somehow safely escape from the box.

The '116 and '360 patents addressed certain problems attendant to the "Shroyer" process, and claim to have solved these problems through use of a layer of material placed over the mold. The patents actually cover the thus-improved "Gasifiable Casting Pattern" (No. '116) and the "Method of Casting in a Mold Which is Coated During Casting" (No. '360). This separation into two patents is mandated by the Patent Office's categories of patentable items, although the essence of both patents is the same.

The problem addressed by the improvement was that of "undesirable reactions [which] may, and frequently do, occur between the molten casting charge and products formed in the gasification of the plastic pattern and/or reactions of the melt or molten charge with the molding material" (Patent No. '116, Column 1, Lines 41–45). This problem of leakage or contact between the molten metal and the sand, or sand-like molding material, would result in an unsatisfactory surface on the finished product—a metal surface with small grains of the molding material embedded in it.

The patents note that the incorporation of a "binder" into the dry, grainy molding material stemmed some of this leakage problem, but that the additional undesirable effect of trapping gases formed in the combustion process, was thereby brought about. The patents note the high cost and unpleas-

ant odor associated with such "binders" as well.

Plaintiff admits that U. S. Patent No. 3,169,288, the "Dewey" patent, is prior art with respect to the claim of both of the patents in suit, and that this prior art disclosed the use of a "dried mold coating composition" on the surface. of a polystyrene mold (Admissions Nos. 13–15, filed December 14, 1977).

The essence of the new solution, therefore, was specifically to coat the mold with a layer of material which would prevent unwanted contact between the molten metal and the molding material, and at the same time allow the escape of gases formed in the combustion process. This is the nature of plaintiff's patent, and the invention which defendant claims is invalid, because it was discovered, publicized and used well before the 1962 dates of plaintiff's invention and patent application.

■ Plaintiff alleges infringement of Claims 1 and 4 of Patent No. '116 and of Claims 1–5 of Patent No. '360.[1]

1. 1. In a casting arrangement, in combination, a member gasifiable substantially without residue on subjection to a molten casting charge and having substantially the configuration of an article to be cast, and

a layer of refractory material present in a significant amount up to a quarter inch applied to the outer surface of said member and dries to a solid condition, said layer being solid and gas permeable at the temperature of the molten casting charge and said member with said layer applied thereto being embedded in a molding material, whereby said member will be gasified upon subjection to the molten casting charge. . . .

4. for use in a casting arrangement, a casting pattern comprising, in combination,

a member gasifiable substantially without residue on subjection to a molten casting charge and having substantially the configuration of an article to be cast, and

a significant layer of refractory material applied to the outer surfaces of said member up to a thickness of one quarter inch which dries to a solid condition, said layer being solid and gas permeable at the elevated temperature of the molten casting charge whereby said member and layer can be wholly embedded in a molding material and the member replaced by the molten casting charge. . .

1. A method of casting, comprising the steps of embedding in a solid mold body a form which is gasifiable substantially without residue on subjection to a molten casting charge and which is shaped for exact reproduction as a casting, covering the surface of said form with a layer consisting of a solid substantially incombustible material which remains solid and is gas-permeable at the temperature of a molten casting charge; providing in said mold body and in said layer a passage for a molten casting charge to said embedded form; and pouring into said passage a molten casting charge for gasifying and replacing said embedded form in said mold body, said layer providing a gas-permeable shell-like coating which is substantially unaffected by the molten casting charge.

2. A method of casting, comprising the steps of embedding in a mold body a form which is gasifiable substantially without residue on subjection to the elevated temperature of a molten casting charge and having distributed there through a substance adapted to act on said molten casting charge, said form being shaped for exact reproduction as a casting; covering the surface of said form with a layer consisting of a solid substantially incombustible material which remains solid and is gas-permeable at the temperature of said casting charge, providing in said mold body and in said layer a passage for a molten casting charge to said embedded form; and pouring into said passage a molten casting charge for gasifying and replacing said embedded form in said mold body, said layer providing a gas-permeable shell-like coating which is substantially unaffected by the molten casting charge.

3. A method of casting, comprising the steps of embedding in a mold body a form which is gasifiable substantially without residue on subjection to a molten casting charge and having distributed there through a substance adopted to act on said molten casting charge, said form being shaped for exact reproduction as a casting, covering the surface of said form with a layer consisting of a solid substantially incombustible material which remains solid and is gas-permeable without temperature of a molten casting charge; providing in said mold body and in said layer a passage for a molten casting charge to said embedded form; and pouring into said passage a molten casting charge for gasifying and replacing said embedded form in said mold body, said layer providing a gas-permeable shell-like coating which is substantially unaffected by the molten casting charge.

4. A method of casting comprising the steps of forming a pattern which is gasifiable substantially without a residue at the elevated temperature of a molten casting charge and which is shaped for exact reproduction as a casting, covering the surface of the pattern so formed with a layer consisting of a solid substantially incombustible material which re-

Defendant asserts that these claims of the two patents are invalid because they fall within three categories of non-patentable discoveries, each of which is independently sufficient to justify a finding of invalidity.

Defendant challenges the plaintiff's claim under 35 U.S.C. § 102(g):

"A person shall be entitled to a patent unless . . . (g) before the application's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it . . ."

Defendant challenges the plaintiff's claim under 35 U.S.C. § 102(a):

"A person shall be entitled to a patent unless . . . (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent . . ."

Defendant challenges the plaintiff's claim under 35 U.S.C. § 102(b):

"A person shall be entitled to a patent unless . . . (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . ."

The undisputed facts applicable to these three challenges, although overlapping, will be explored seriatim, below.

## II. Summary Judgment

■ The case law directs this court to circumspection in its disposition of summary judgment motions in patent cases. Recognizing that patent litigation can be complex, and that the technical assistance of expert witnesses can be enlightening in areas where a lay-person's knowledge is insufficient, the courts have approached such motions cautiously.

However, the law is equally clear that when there is no genuine dispute as to any material fact, and one party is entitled to judgment, then summary judgment must enter as it must in any other matter before the court. The Sixth Circuit has stated:

"In appropriate circumstances when the invention is easily understood and there is no need for expert testimony, summary judgment may be a useful tool in cases where the validity of a patent is involved." (*Tee-Pak, Inc. v. St. Regis Paper Company*, 491 F.2d 1193, 1195 (1974).

■ Following the *Tee-Pak* decision, the Sixth Circuit has reaffirmed the propriety of summary judgment in patent cases and held it to be a useful method of resolving claims of invalidity, used sparingly. See *Atlas Chemical Industries, Inc. v. Moraine Products*, 509 F.2d 1 (6th Cir. 1974.)

These holdings are consistent with the decisions of the Circuits dating back more than twenty years. They are particularly apt in a situation such as the instant cause presents, where the patented invention is not exceedingly complex, the court is thoroughly apprised of the factual aspects of the case, and of the clear absence of a genuine dispute as to any material fact. Such apprisal has occurred here through the court's examination of depositions, interrogatory answers, admissions, file wrappers, extensive briefs and its consideration of the excellent oral arguments of both sides.

In *Bobertz v. General Motors Corporation*, 228 F.2d 94 (6th Cir. 1955) at 99–100, this circuit affirmed the district court's entry of summary judgment, noting with approval the court's observation that:

mains solid and is gas-permeable at said elevated temperature, embedding the covered pattern in a mold body, providing in said mold body and in said layer a passage for a molten casting charge, and pouring into said passage a molten casting charge at a temperature above said elevated temperature to gasify and replace said embedded pattern in said mold body, said layer providing a gas-permeable shell-like coating which is substantially unaffected by the molten casting charge.

5. The method set forth in claim 4 wherein said layer consists of a solid refractory material suspended in a liquid and including the step of drying said liquid after the application thereof to said pattern.

"Both parties in this case resorted to extensive discovery proceedings, filing of affidavits and exhibits, and making admissions. The court also had the benefit of the Patent Office file wrapper showing the history of the prosecution of this patent. The thoroughness of the pre-trial activities of both parties resulted in the elimination of any genuine issue of material fact in dispute. Under such circumstances it has been held that where no factual issues are present and where the patents and products involved are sufficiently simple to make expert testimony unnecessary, disposition under Rule 56, 28 U.S.C.A., is proper." See also, *Ballantyne Instruments & Electronics, Inc. v. Wagner*, 345 F.2d 671 (6th Cir. 1965).

In this case, the presentation of both counsel, written and oral, has been most complete, distilling for the court some four years of discovery. The nature of the patented object and process—already relatively uncomplicated—has been made even clearer through these presentations. The background and history of this patent and its predecessors have been explained and agreed upon.

Most importantly, the focus of dispute has been narrowed to the point that there is no *genuine* disagreement as to the material facts.

### III. *35 U.S.C. § 102(g)—Prior Invention*

#### A. *Facts Not in Dispute*

A detailed examination of Claims 1 and 4 of the '116 patent, the only claims which plaintiff asserts to be infringed, will reveal the essence of the litigation. The wording of these two claims is virtually identical, the first describing a "casting arrangement" and the second a "casting pattern" for use in that "casting arrangement". An examination of the language of the '116 patent will serve in understanding the '360 patent as well, as the latter merely describes the same elements, together with the process in which they are used. There is no dispute that the process itself is old and known to the prior art. Plaintiff admitted this in response to defendant's December 14, 1977 Request to Admit # 3.

The common claim of plaintiff's patents is:

"In a casting arrangement, in combination, a member gasifiable substantially without residue on subjection to a molten casting charge and having substantially the configuration of an article to be cast . . . ."

[this portion merely restates the prior art known and used from the since-expired "Shroyer" patent, Request to Admit # 4]

and a layer of refractory material present in a significant amount up to a quarter of an inch applied to the outer surface of said member and dries [sic] to a solid condition . . .

[this portion also reflects the prior known art of applying coatings to the mold. Though the coatings did not always successfully prevent the leakage problems. There is no dispute that some sort of refractory coatings were used—Requests Nos. 13, 14, 15],

said layer being solid and gas permeable at the temperature of the molten casting charge

[this element is the crux of plaintiff's arguments against entry of summary judgment and is discussed in full below]

and said member with said layer applied thereto being embedded in the molding material, whereby said member will be gasified upon subjection to the molten casting charge."

[This is undisputedly a restatement of prior known art, pursuant to Requests 4, 13, 14, 15].

This court's focus, therefore, must be directed to the question of whether or not there was prior invention of a coating which is "solid and gas permeable at the temperature of the molten casting charge." These two aspects, solidity and gas permeability, are to be found in the mold coatings which Dr. Merton C. Flemings undisputedly developed, at the Massachusetts Institute of Technology in 1959–60, more than two years prior to the plaintiff's claimed invention. There are other conceivable elements

which plaintiff points to, in order to distinguish Dr. Flemings' work from the actual product and process licensed by plaintiff. However, those elements (such as the thickness of the coating, the range of permeability to gas, and the composition of the coating) need not be addressed by this court. They are not expressly contained in the patent claims, and they are admitted by plaintiff to be non-critical to the application of his process (in answers to interrogatories, admissions, and elsewhere, including in oral argument before this court).

Furthermore, the conformance of Dr. Flemings' work to the coating and process now widely licensed by plaintiff can be inferred from neutral observations of the results of that work. For example, plaintiff has admitted that "too thin a coating will not provide adequate burn-in protection" (Interrogatory No. 76) and too little permeability will result in cracks in the coating and "gas buildup so great it bursts the whole coating permeability to escape." (Interrogatory No. 80). Neither of these events occurred during Dr. Flemings' work, according to his unchallenged testimony and the undisputed publicity which surrounded his work.

### B. Dr. Flemings' Work

Review of Dr. Flemings' deposition, supported by exhibits, demonstrates that beginning in 1959, he developed a metal-casting process which contains all of the elements of plaintiff's patented claims. None of the facts of this development are disputed by competent evidence.

The scenario which led to Dr. Flemings' invention began with his visit in 1958 to the shop of Mr. Al Duca in Boston, Massachusetts. At this time, Dr. Flemings was a faculty member of The Massachusetts Institute of Technology, and had been since 1956, having obtained his doctoral degree there in metallurgy. Al Duca is an artist who had been working with polystyrene patterns in making small metal castings. Dr. Flemings noted Mr. Duca's work with interest, and obtained a Rockefeller Foundation grant for a joint research project to be undertaken by M.I.T. in this area. Funding from the foundation began on January 1, 1959.

Dr. Flemings testified that he and Mr. Duca grew concerned about metal penetration into the molding material—the same problem addressed in the allegedly infringed patent claims—which tended to cause unattractive surfaces on the art objects cast. Calling on his experience with the use of "mold washes" then in ordinary industrial practice, Dr. Flemings and Mr. Duca then sought to solve the surface-problem by the use of coatings on the mold. The term "mold wash" is evidently an equivalent for "mold casting", as used in the patent claims herein.

The polystryene molds used in this research at M.I.T. were eventually coated with an alcohol-based, zircon proprietary wash, according to the undisputed testimony and contemporary documentation of Dr. Flemings. This type of wash is exactly that recommended to licensees of the plaintiff in its "Recommended Specifications and Instructions", a copy of which was furnished to this court. Plaintiff is unable to refute the obvious inference that they would not recommend a mold coating to their licensees which was *not* "solid and gas permeable." On the contrary, logic compels the conclusion that an alcohol-based, zircon coating fits the "teaching" of the '116 and '360 patents, and that it is also the coating anticipated by Dr. Flemings and his colleagues at M.I.T. in 1959–60.

This testimony, given twenty years after the invention at M.I.T., is fully corroborated by a series of contemporaneous documents and articles, submitted to the court by defendant. The latter include reports from the Archives of the Rockefeller Foundation, proceedings of the American Foundrymen's Society, *"Technology Review Magazine,* 1960, *"Foundry Trade Journal",* 1960, 1961 and 1962, *"Light Metal Age"* 1960, and others.

These articles all report on the joint work of Mr. Duca, Dr. Flemings and a Professor Taylor at M.I.T., in varying detail. Most important in their corroborative effect,

however, are the "Proposal for Grant Continuation" which was submitted to the Rockefeller Foundation on January 6, 1960, and the report of a paper delivered by Dr. Flemings and colleagues to the American Foundrymen's Society in May of 1962.

The former document, signed by Mr. Duca, but written cooperatively with Dr. Flemings, describes in full the metal-penetration problem and its solution by painting the mold with a "specially prepared refractory slurry."

The latter document, describing work which had been done earlier than the date of the report itself, specifically discusses the coating used on the molds and the absence of any penetration problem.

Dr. Flemings' testimony supplements these facts with an assertion that deliberate efforts were made to close off any vents for escaping gases, so that the gases formed by combustion could only escape through the coating into the molding material.

The deposition of Dr. Flemings, taken together with the exhibits, can be no clearer—research at M.I.T. duplicated the essential elements of the claims in plaintiff's patents, at a time pre-dating plaintiff's asserted "invention" by from two to three years. These facts are *not* disputed by the wholly-conclusory affidavits submitted by plaintiff. Those affidavits offer the court no more than the conjecture that Dr. Flemings' work was not with sufficiently-permeable mold coatings. In the face of Dr. Flemings' unrebutted testimony and the corroborative evidence of the success of his work, even in large castings (such as the 9-foot Crucifix, the 400 pound Pegasus, and the life-size statue of Adam), such conjecture cannot preclude summary judgment. Plaintiff's affiants' doubts notwithstanding, the facts of prior invention are unassailable.

### C. Applicable Law

Under 35 U.S.C. § 102(g) the plaintiff's patent shall be declared invalid if another person conceived of the patented item or process and reduced it to practice prior to plaintiff's invention, and if that prior inventor neither abandoned, concealed or sup-

pressed it. These are the sole criteria to be applied, and no others are necessary to a holding of invalidity. It is worth noting that, although public access to the invention is an element of defendant's challenges to validity under 35 U.S.C. § 102(a) and 35 U.S.C. § 102(b), no such requirement is found under § 102(g), *International Glass Company v. United States*, 408 F.2d 395, 187 Ct.Cl. 376 (1969).

Neither is it necessary for the prior inventor, Dr. Flemings, to have sought or obtained a patent, *International Glass, supra.*

The leading case in this area, cited repeatedly in subsequent decisions, is *Corona Cord Tire Co. v. Dovan Chemical Corporation*, 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610 (1928). In interpreting the predecessor statute to 35 U.S.C. § 102(g), the Supreme Court examined a case very similar to the one proven here. In *Corona*, the Court invalidated a patent where the challenger showed work on the same process prior to that by the patent-holder, which work was established by oral testimony and corroborated by contemporaneous documents (including, as in the instant case, a report to a trade society in the related field). The Court noted that the fact that the prior inventor was the sole witness in support of the challenge (as here) did not preclude a finding as to validity. The Court also noted that "reduction to practice" is defined as the successful performance of a process. In the instant case, such successful performance, by production of large metal castings without surface defects and without explosions of gases, is undeniably proven.

Later, *Smith v. Hall*, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049 (1936), reaffirmed the elements of a § 102(g) invalidity claim as set forth in *Corona*, and further emphasized that the prior inventor's full and precise knowledge of the scientific principles involved in the invention, is *not* necessary to the challenger's case—"it is enough if he knew and used the method with operative success." Dr. Flemings' successful use of an alcohol-base zircon coating is unrefuted.

Neither can there be any claim that Dr. Flemings' work was abandoned, concealed or suppressed. Defendant has submitted numerous articles reporting on the work at M.I.T., both in trade journals and a popular magazine. The work was funded by the Rockefeller Foundation, and reports urging the original and continued support from this organization are before the court. Photographs and contemporaneous descriptions of the M.I.T.-developed process constitute more than enough evidence to rebut plaintiff's lone affidavit asserting that during affiant's student years the M.I.T. labs were closed to the public. In fact, the pamphlet entitled "Policies and Procedures: Massachusetts Institute of Technology, Revised to August, 1957", submitted by plaintiff, reveals no such policy at all.

In short, there can be no doubt that claims 1 and 4 of patent '116, and claims 1 through 5 of patent '360 were anticipated by Dr. Flemings' work, and in fact were invented by him, several years prior to plaintiff's invention on April 2, 1962. Nothing more definite than, or different from, Dr. Flemings' work is described in these claims.

Defendant's motion for summary judgment, based upon the invalidity of plaintiff's patents under 35 U.S.C. § 102(g), must be, and is, granted.

### IV. 35 U.S.C. § 102(a)—Prior Knowledge

The challenge to the validity of plaintiff's patents under this subsection is determined by much the same criteria as under § 102(g).

■ That is, if the essential elements of the patented item or process is in prior use, and this process has been reduced to practice, then the patent is invalid.

Additionally, the courts have, at various times, inferred that the process or product's use must be at least minimally accessible to the public. Although there is some question as to the vitality of this criterion, it has been described as constituting, at its most restrictive, a requirement that no affirmative steps were taken to conceal the prior use.

Here, certainly, there was no attempt to "hide" the metal-casting process, using coated molds. The testimony and exhibits point to a completely open policy, as represented by the journal articles which appeared in print, largely as a result of an M.I.T. press release.

In *Dunlop Company, Ltd. v. Kelsey-Hayes Company*, 484 F.2d 407 (6th Cir. 1973), cert. denied 415 U.S. 917, 94 S.Ct. 1414, 39 L.Ed.2d 471, the court held:

"The novelty required by 35 U.S.C. § 102(a) is lacking where there has been anticipation by an earlier device, whether patented or not, where all the elements of the patent, doing substantially the same work in the same way are found in a single prior art structure. *A. J. Industries, Inc. v. Dayton Steel Foundry Co.*, 394 F.2d 357 (6th Cir. 1968)." *Dunlop, supra*, at 414.

This court also notes that the *Dunlop* decision affirmed the district court's finding of invalidity under § 102(a), (b) and (g), where the older devices in question "constitute prior art and were known or used by others in this country, [and where] the uses were public and not secret or purely experimental . . . ."

As with the claim under § 102(g), the court notes that there is undisputed testimony and documentary evidence regarding prior knowledge or use, and that such use was neither short-lived nor merely experimental, but was openly shared, publicized, and developed by M.I.T. personnel with the intention of aiding the metal foundry industry as well as metal-working artists.

On this basis, independently of the § 102(g) claim, defendant's motion for summary judgment must also be granted.

### V. 35 U.S.C. § 102(b)—Public Use

It would appear that the challenge to the patent based on this section would place the heaviest burden of all three on the defendant. However, the court finds that defendant has also proved this statutory bar to be applicable in this matter.

The facts of Dr. Flemings' activities at M.I.T. in 1959–60 and onward, a number of years prior to plaintiff's April 2, 1963 application for invention, need not be reiterated here. The work took place, as described above, well before the one-year time prior to application which is set forth in this section of the statute.

Defendant is entitled to judgment on the basis of this statutory bar, inasmuch as the use to which the coated-mold-process was put in 1959–60 was undeniably "public" within the meaning of the legislation, as interpreted by the Courts.

Beginning with a long line of 19th Century Supreme Court cases, "public use" has been defined very broadly. In *Consolidated Fruit Jar v. Wright*, 94 U.S. 92, 24 L.Ed. 68 (1877), the Court held that even a single instance of "use" was sufficient to call this bar into play. The Supreme Court has also held that mere experimental use is enough, *Elizabeth v. Pavement Company*, 97 U.S. 126, 24 L.Ed. 1000 (1877), and that the unconditional furnishing of the product to one personal friend, by the inventor, also satisfies the statutory meaning, *Egbert v. Lippman*, 104 U.S. 333, 26 L.Ed. 755 (1881). Commercial use for profit, even if only in one instance has more recently been held to constitute "public use", *Electric Storage Battery Co. v. Shimadzu*, 307 U.S. 5, 59 S.Ct. 675, 83 L.Ed. 1071 (1938).

The Sixth Circuit has further clarified this area in *Dunlop Company, Ltd. v. Kelsey-Hayes Co., supra*, at 413, which noted that the defendant's burden is to provide the court with clear and convincing evidence of "public use" (as has been done here), and states:

> "A single public use or a mere placing of the invention on sale meets the requirements of the statute. In *F.M.C. Corporation v. F. E. Myers and Bro. Co.*, 384 F.2d 4 (6th Cir. 1967), cert. denied 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968), "public use" was defined as "any nonsecret use of a completed and operative invention in its natural and intended way. 384 F.2d at 9."

The public exposure of the process developed by Dr. Flemings is obvious, and goes well beyond the threshold requirement of the case law.

Defendant's Motion must accordingly be granted under 35 U.S.C. § 102(b) as well.

IT IS SO ORDERED.